**From:** Jose Peraza [mailto:jose@tankshipintl.com]
**Sent:** Friday, October 21, 2016 3:48 PM
**To:** Jesus Uribe (juribe@petroleaoil.net) <juribe@petroleaoil.net>; pmantellini@petroleaoil.net; Matias Aguirre <matias@capetankers.com>; Michael Vogdes <Michael@capetankers.com>; Ignacio Seminario <Ignacio@capetankers.com>
**Cc:** CapeTankers <cape@capetankers.com>; Tankship <tankship@tankshipintl.com>
**Subject:** FINAL RECAP MT OVERSEAS VISAYAS "OOSS" / PETROLEA OIL CO / CP OCT 21, 2016 REVISED (COMMERCIAL OPERATOR)

```
OCT 21, 2016

TO: PETROLEA OIL CO - ATT MR JESUS URIBE / MR PEDRO MANTELINI
TO: CAPE TANKERS - ATT MR MATIAS AGUIRRE / MR MIKE VOGDES / MR IGNACIO SEMINARIO

FM: TANKSHIP INTERNATIONAL LLC


RE: FINAL RECAP MT OVERSEAS VISAYAS "OOSS" / PETROLEA OIL CO / CP OCT 21, 2016 REVISED
(COMMERCIAL OPERATOR)


WITH ALL SUBS DULY LIFTED, WE ARE PLEASED TO RECAP THE FOLLOWING FIXTURE AS FOLLOWS:


CHARTERERS:          PETROLEA OIL CORP.
                     1867 N.W. 97TH AVE.
                     DORAL, FL. 33172

REGISTERED OWNERS:   CARL PRODUCT CORPORATION
                     THE TRUST COMPANY OF MARSHALL ISLANDS INC. TRUST COMPANY
                     COMPLEX AJETAKE ISLANDS MAJURO, MARSHALL ISLANDS MH96960
                     TEL: +44 141 243 2435
                     FAX: +44 141 243 2436
                     TELEX: NOT APPLICABLE
                     EMAIL: OVISAVC@VSHIPS.COM
                     COMPANY IMO#: 5317942
```

**EXHIBIT "A"**

1

```
COMMERCIAL OPERATORS:    PANAMAX INTERNATIONAL C/O CAPE TANKERS INC.
                         TOWER FINANCIAL CENTER, 16TH FLOOR, 50TH STREET AND ELVIRA
                         MENDEZ
                         P.O BOX 0816-01560, PANAMA CITY, PANAMA
                         CHILE
                         TEL: +1 954 771 7757
                         FAX: N/A
                         TELEX: N/A
                         EMAIL: CAPE@CAPETANKERS.COM
                         WEB: N/A


TECHNICAL OPERATOR:      V.SHIPS UK LIMITED
                         SKYPARK, 8 ELLIOT PLACE, GLASGOW G3 8EP, UK
                         TEL: +44 (0) 141 243 2435
                         FAX: +44 (0) 141 243 2436
                         TELEX: 776311 VSHIPS G
                         EMAIL: OLEYTVC@VSHIPS.COM
                         WEB: HTTP://WWW.VSHIPS.COM
                         COMPANY IMO#: 5611403
                         UNITED KINGDOM
                         TEL: +44 (0) 141 243 2435
                         FAX: +44 (0) 141 243 2436
                         TELEX: 776311 VSHIPS G
                         EMAIL: OLEYTVC@VSHIPS.COM
                         WEB: HTTP://WWW.VSHIPS.COM
                         COMPANY IMO#: 5611403


CP FORM:                 EXXONMOBIL VOY 2005


CP DATE:                 OCT 21, 2016


A) VESSEL DESCRIPTION

VESSEL       : OVERSEAS VISAYAS
IMO NUMBER:  : 9301952
EX-NAME      : CARL JACOB
SDWT         : 74933.00 MT
SDRAFT       : 14.32 M
LOA          : 228.00 M
BEAM         : 32.24 M
FLAG         : MARSHALL ISLANDS
BUILT        : SEP 08, 2006
CLASS        : AMERICAN BUREAU OF SHIPPING
STOPPERS     : 2  X 200.00 MT - TOUNGUE TYPE
CHAIN SIZE   : 76.00 MM
CUBIC 98 PCT : 80365.3 M3 (EX SLOPS)
SLOP 98 PCT  : 2866.8 M3
TOTAL 98 PCT : 83232.10 M3
SEGREGATIONS : 3
PUMPS        : 3 X 2000 CU. METRES/HOUR (CENTRIFUGAL)
TPC/TPI      : 68.20 MT / 170.5 LT
BCM          : 112.00 M
KTM          : 49.54 M
IGS          : YES
COW          : YES
SBT/CBT      : SBT
VRS          : YES
GRT          : 42403.00
NRT          : 21777.00
PCNT         : 35121.00
SCNT         : 38968.19
CRANES       : 1  X 15.00 MT
```

```
COATED          : EPOXY , WHOLE TANK
HULL            : DOUBLE HULL
CALL SIGN       : V7NE6
P AND I         : NORTH OF ENGLAND
QUALIFIED IND: O'BRIEN'S OIL POLLUTION SERVICE
OSRO            : NATIONAL RESPONSE CORPORATION
COC/TVEL        : AUG 11, 2017
ISPS            : NOV 29, 2019

CP SPEED:           13.0 KT WSNP
LAST 3 CARGOES:     FUEL OIL / CRUDE / CRUDE
APPROVALS:          TBOOK- VALERO / P66 / IDEMITSU
```

"IN OWNERS OPTION SUITABLE SUBSTITUTE ALWAYS APPROVED BY CHARTERERS NOT TO BE UNREASONABLE WITHELD"

ATTACHED

- ➢ BIMCO ANTI-CORRUPTION CLAUSE FOR CHARTER PARTIES
- ➢ EXXONMOBIL VOY 5 CP
- ➢ Q88
- ➢ VPQ
- ➢ ISSC
- ➢ SAFETY CONSTRUCTION
- ➢ P&I ENTRY
- ➢ VAPOUR CERT
- ➢ WRECK REMOVAL CERTIFICATE
- ➢ CLASS STATUS REPORT
- ➢ CLC
- ➢ CLBC
- ➢ IOPP INCLUDING ITS FORM B
- ➢ USM CHECKLIST
- ➢ CREW MATRIX

- ITINERARY - PRESENTLY @ MELONES (WC PANAMA) WITH ETB/ETD OCT 23/25, 2016. PANAMA CANAL "NB" TRANSIT OCT 26/27, 2016. ETA BASIS GUARANAO PILOT STATION OCT 29, 2016

- MAX LIFT BSS 36 FW MARACAIBO LAKE SAILING DRAFT BASIS NHC API 30 - ABOUT 340,917 NBBLS ~ 47,384 MT

VENEZUELA PORT STATE CONTROL

- IS MANDATORY FOR ALL VESSELS ARRIVING AT ANY TERMINAL SHIPPING WITH INTENT TO PERFORM CARGO OPERATIONS, THAT ARRIVING WITH ALL CARGO TANKS UNDER INERT GAS CONDITION AND COMPLY WITH ISGOTT REGULATION 16.7.1. TABLE 16-3 ON COMPOSITION OF INERT GAS, H2S CONCENTRATIONS HAVE THESE SHOULD NOT EXCEED 10% PPM, OTHERWISE THE VESSEL SHALL BE ANCHOR AT ANCHORAGE AREA IN ORDER TO CONDUCT OF CARGO TANK IN CONDITIONS, TO ACHIEVE CONDITIONS DESCRIBED FROM THAT TIME WILL BE ACCEPTED THE SERVICE "READY TO LOAD/NOTICE OF READINESS" BY THE VESSEL - CONFIRMED

- THE VESSELS MUST ARRIVE WITH "CLEAN SEGREGATED BALLAST WATERS", IF NECESSARY, THE VESSEL MUST CHANGE BALLAST AT LEAST TWO DAYS BEFORE ARRIVAL AT MARACAIBO LAKE. FOR ANY VESSELS ARRIVING AT OURS TERMINAL SHIPPING IS NECCESARY PRESENT TO TERMINAL REPRESENTATIVE THE BALLAST WATER REPORTING FORM AGREE RESOLUTION IMO A.868(20) - CONFIRMED

- OWNER WARRANTS VESSEL COMPLIES WITH MAX AIR DRAFT 136' - CONFIRMED

B) LAYDAYS:

OCT 29-31, 2016 (00:01-23:59)

**C) LOADING RANGE(S)/PORTS(S)/PLACE(S):**
    1-2 SAFE PORT(S) CARIBS EXC C/O/H - INTENTION LA SALINA, MARACAIBO LAKE

**D) DISCHARGING RANGE(S)/PORT(S)/PLACE(S):**
    1-2 SP(S) INCLUDING STS LOCATIONS MALAYSIA (TANJUN PELEPAS - LINGGI RANGE)

    ROUTING - LADEN PASSAGE VIA CAPE OF GOOD HOPE

    FOLLOWING FSU UNITS @ MALAYSIA HAVE BEEN ALREADY CLEARED BY OVERSEAS VISAYAS'
OWNERS:

    M/T'S SEA HORIZON & SEA EQUATORIAL ARE SUITABLE FOR STS TRANSFER PROVIDED THAT THE
OPERATIONS ARE CARRIED OUT IN FULL COMPLIANCE WITH THE OCIMF/ICS/ISGOTT STS
TRANSFER GUIDE IN THE PRESENCE OF A QUALIFIED MOORING MASTER AND THAT SUITABLE AND
APPROVED STS EQUIPMENT ARE PROVIDED FOR THE OPERATION. THE VESSEL RETAINS THE RIGHT
TO DECIDE ON THE OPERATION AFTER A VISUAL ASSESSMENT OF THE CONDITION OF THE OTHER
VESSEL.

    MASTER OF M/T OVERSEAS VISAYAS WILL ALWAYS HAVE THE OVERRIDING RESPONSIBILITY &
AUTHORITY TO REJECT THE SHIP, SHOULD HE FINDS THE SAME TO BE UNSAFE FOR SUCH
OPERATION. HE WILL ALSO HAVE THE RIGHT AT ALL TIMES AT HIS DISCRETION TO
DISCONTINUE THE OPERATION IF AT ANY TIME HE CONSIDERS IT TO BECOME UNSAFE. FENDERS
AND ALL OTHER EQUIPMENT NEEDED TO BE SUPPLIED AND PAID FOR BY CHARTERERS.

    FURTHER ALL FSU'S CERTIFICATES AND INSURANCE PAPERS/COVER TO BE VALID/IN FORCE UPON
CARRYING OUT THE STS OPERATION.

**E) CARGO QUANTITY:**
    CHOPT FULL CARGO

**F) CARGO / SEGREGATION / HEAT:**
    NO HEAT CRUDE MAX 2 GRADED WVNS

**G) FREIGHT RATE:**
    LUMP SUM USD 2,275,000 BASIS 1 TO 1 "ALL INCLUSIVE" EXCEPT MARACAIBO LAKE CLAUSE
STATED HEREIN
    OVERAGE: N/A

**H) BANKING DETAILS:**
    FREIGHT IS PAYABLE IN USD BY TELEGRAPHIC TRANSFER TO,
    BENEFICIARY - PANAMAX INTERNATIONAL SHIPPING COMPANY LTD.
    ██████████████████████
    BANK - J.P. MORGAN CHASE BANK NA
    1 CHASE MANHATTAN PLAZA
    NEW YORK, NY 10017
    FED/ABA - 021000021
    SWIFT - CHASUS33:

**I) LAYTIME:**
    LOADING 36 HRS
    DISCHARGING 36 HRS
    INDEPENDENT OF EACH OTHER (TO STAND ALONG WITH EACH IN REGARDS TO TIME)

**J) DEMURRAGE:**
    USD 22,500 PDPR

**K) SPECIAL PROVISIONS:**

WSHTC - N/A FOR THIS VOYAGE

CHARTERERS HAVE AGREED TO PAY UPFRONT WITHIN 24 HRS AFTER LIFTING ALL SUBS AN AMOUNT EQUIVALENT TO USD 300,000.00 TO OWNERS DESIGNATED BANK ACCT IN THIS CP. THIS AMOUNT WILL BE DEDUCTED AT SOURCE BY CHARTERERS AGAINST FINAL FREIGHT PEYMENT. IF CHARTERERS FAIL TO TIMELY DEPOSIT THE AGREED UPFRONT AMOUNT, OWNERS HAVE THE RIGHT TO "TERMINATE" THIS CP UNDER NO FURTHER OBLIGATION. MOREOVER, IF AFTER 10 CONSECUTIVE DAYS OF VESSEL'S ARRIVAL TO THE LOADING PORT THE CARGO OPERATION HASN'T STARTED, OWNERS ALSO HAVE THE RIGHT TO "TERMINATE" THIS CP UNDER NO FURTHER OBLIGATION WITHHOLDING THE UPFRONT AMOUNT AGAINST DAMAGES. IF THIS CP IS TERMINATED FOR EITHER REASON, THERE WILL BE NO FURTHER OBLIGATION OR PENALTY TO EITHER PARTY.

**OTHERWISE PER LAST DONE BETWEEN VALERO & PANAMAX INTERNATIONAL MT MAYA CP OCT 11, 2016 WITH LOGICAL AMENDMENTS WHERE APPLICABLE AS FOLLOWS:**

**NOTE – ANY REFERENCE TO "VALERO ENERGY CORPORATION" TO READ "PETROLEA OIL CO"**

**BBB CLAUSE**
FREIGHT AND CLEANING EXPENSES RELATED TO HULL CLEANING IN LAKE MARACAIBO (IF ANY), TO BE PAID BY CHRTRS TO OWNS IN ADVANCE PRIOR TO COMMENCEMENT OF DISCHARGING. ANY INCURRED DEMURRAGE AT LOADING PORT TO BE PAID WITHIN 10 CALENDAR DAYS AFTER SAILING LOADPORT AND ANY INCURRED UNDISPUTED DEMURRAGE AT DISCHARGE PORT TO BE PAID ON A WEEKLY BASIS.

OWNERS HAVE THE RIGHT TO REFUSE TO COMMENCE DISCHARGING AND/OR INTERRUPT DISCHARGING IF ANY PAYMENTS DUE UNDER THE C/P ARE NOT RECEIVED IN THE OWNERS DESIGNATED BANK ACCOUNT.

ANY TIME AND/OR DEMURRAGE ON ACCOUNT OF DELAYS IN OWNERS NOT RECEIVING ANY PAYMENTS (IE. FREIGHT, ADVANCED DEMURRAGE) DUE UNDER THE C/P BEFORE COMMENCEMENT OF DISCHARGING, AND ANY EXPENSES/COSTS FOR UNBERTHING/REBERTHING DUE TO ABOVE MENTIONED DELAYS, WILL BE FOR CHRTRS ACCOUNT.

**INTERIM PORT CLAUSE**
CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST WITH ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT.

TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT I.E. NO ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING EVEN FROM ANCHORAGE TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA AND WEATHER CONDITIONS. DEVIATION AND TIME USED TO BE CALCULATED AT DEMURRAGE RATE PER DAY PRO RATA PLUS COST FOR ADDITIONAL BUNKERS CONSUMED AS PER MASTERS TELEX STATEMENT.

DEVIATION, TIME USED, BUNKERS CONSUMED AND PORT COSTS AS PER AGENTS D/A TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEXED/EMAIL INVOICE, WHICH LATER TO BE SUPPORTED BY HARD COPY DOCUMENTATION.

**MARACAIBO LAKE CLAUSE**
IN CASE THE HULL IS FOULED IN LAKE MARACAIBO FROM OIL POLLUTION WHILE TRANSITING IN, OUT AND/OR WAITING AT ANCHORAGE, TIME AND EXPENSES FOR HULL CLEANING, IF ANY, TO BE FOR CHARTERERS ACCOUNT. MOREOVER, ANY DELAY WITHIN THE LAKE FOR REASONS BEYOND OWNERS' CONTROL TO BE FOR CHARTERERS ACCOUNT.
DURING THE DURATION OF THE PRESENT CHARTER PARTY OWNERS OR AGENTS OF THE OWNERS INCLUDING BUT NO LIMITED TO THE MASTER HAVE THE OPTION TO PERFOM/INSTRUCT AN UNDERWATER INSPECTION OF THE VESSEL'S HULL FOR ANY REASON WHATSOEVER, ALWAYS RELATED TO CARGO OPERATION, WITH ALL TIME AND COST OF THE SAME TO BE FOR CHARTERERS ACCOUNT.

~~VALERO OGVR CLS~~
~~WHTC NOTWITHSTANDING , ANY COSTS ASSOCIATED WITH COMPLIANCE OF THE CALIFORNIA OCEAN-GOING VESSEL REGULATORY ZONE REGULATIONS ARE FOR OWNERS' ACCOUNT. (N/A THIS VOYAGE)~~

**VALERO COLOMBIA FORCE MAJURE CL:** AS AMENDED (THIS CLAUSE SHALL BE CONSIDERED ON CASE BY CASE BASIS): "IN THE EVENT THAT SUPPLIERS 'ECOPETROL' DECLARE A FORCE MAJURE WITHIN FORTYEIGHT (48) HOURS AFTER LIFTING SUBJECTS,CHRTR SHALL HAVE THE RIGHT TO CANCEL THIS CP. SUCH DECLARATION OF CANCELLATION BY CHRTRS SHALL BE MADE WITHIN 24 HRS OF SUCH FORCE MAJURE NOTIFICATION. IF CHRTS CANCEL THE CP THEN CHRTRS SHALL PAY TO THE OWNERS A CANCELATION FEE EQUIVALENT TO THREE (3) DAYS DEMURRAGE PAYABLE PROMPTLY AGAINST RECEIPT OF OWNERS INVOICE" – N/A FOR THIS VOYAGE

**VALERO FATCA CLAUSE**
EACH PARTY AGREES TO PROVIDE TO THE OTHER PARTY SUCH FORMS AND DOCUMENTATION AS MAY BE REQUIRED OR REASONABLY REQUESTED FOR TAXATION REASONS IN ORDER TO ALLOW THE OTHER PARTY TO MAKE PAYMENT UNDER THIS CHARTER PARTY WITHOUT DEDUCTION OR WITHHOLDING FOR OR ON ACCOUNT OF ANY TAX, SUCH ORIGINAL FORMS AND DOCUMENTATION, INCLUDING ANY NECESSARY CERTIFICATIONS, TO BE COMPLETED AND DELIVERED TO THE REQUESTING PARTY PRIOR TO THE RELEVANT PAYMENT DUE DATE. IF A PARTY FAILS TO COMPLY WITH THE FOREGOING UNDERTAKING, THE OTHER PARTY SHALL BE ENTITLED TO MAKE ANY APPROPRIATE DEDUCTIONS OR WITHHOLDINGS FROM PAYMENTS DUE UNDER THIS CHARTER PARTY FOR OR ON ACCOUNT OF ANY TAX, AND SUCH DEDUCTION OR WITHHOLDING SHALL NOT CONSTITUTE A BREACH OR DEFAULT HEREUNDER.

**ALGERIAN WEATHER**
IF WEATHER DELAYS AT LOADPORT (ALGERIA) FIRST 48 HOURS TO BE HALF-TIME THEREAFTER FULL TIME TO COUNT AT LOADPORT WPON – N/A FOR THIS VOYAGE

**PANCANAL CL**
MAX 24 HRS AWAITING PANAMA CANAL TRANSIT TO BE FOR OWNERS ACCT AND IF PREBOOKING REQUIRED THEN NORMAL PRE-BOOKING FEES TO BE SPLIT 50/50 BETWEEN OWNERS/CHTRS. SUCH PANAMA WAITING AND PRE-BOOKING COSTS ARE BASIS LADEN LEG ONLY – N/A FOR THIS VOYAGE

OWNERS CONFIRM THAT THE VESSEL WILL COMPLY WITH CALIFORNIA REGULATION 13 CCR, SECTION 2299.2, EFFECTIVE 01 JULY 09 AND , IF REQUESTED, WILL PROVIDE VALERO A COPY OF THE SIGNED AND STAMPED REQUIRED RECORDKEEPING – N/A FOR THIS VOYAGE

A NOTICE OF READINESS TENDERED BEFORE THE VESSEL HOLDS A VALID CERTIFICATE OF COMPLIANCE (COC) IS INEFFECTIVE. SUCH AN NOR DOES NOT CONSTITUTE SUBSTANTIAL READINESS UNDER THIS CHARTER.

U.S. DENIED PARTIES, SANCTIONS AND EMBARGOS COMPLIANCE CLAUSE – AS AMENDED BELOW: OWNER REPRESENTS AND WARRANTS THAT NEITHER THE VESSEL, NOR OWNER OR DISPONENT OWNER  APPEAR ON ANY OF THE DENIED PARTY LISTS ADMINISTERED BY ANY AGENCY OR INSTRUMENTALITY OF THE U.S. GOVERNMENT, INCLUDING BUT NOT LIMITED TO THE U.S. DEPARTMENT OF TREASURY, OFFICE OF FOREIGN ASSETS CONTROL'S ("OFAC") SPECIFICALLY DESIGNATED NATIONALS AND BLOCKED PERSONS LIST.  OWNER SHALL COMPLY WITH UNITED STATES LAWS AND REGULATIONS CONCERNING SANCTIONED AND/OR EMBARGOED COUNTRIES AND WARRANTS THAT NEITHER OWNER NOR DISPONENT OWNER ARE ORGANIZED UNDER THE LAWS OF, ACTING AT THE DIRECTION OF, OR OPERATING UNDER THE FLAG OF, ANY COUNTRY SUBJECT TO A COMPREHENSIVE EMBARGO OR SANCTIONS PROGRAM OF THE UNITED STATES, INCLUDING IRAN, CUBA, SUDAN OR NORTH KOREA.

OWNER SHALL RELEASE, DEFEND (UPON VMSC'S REQUEST), INDEMNIFY, AND HOLD ~~VALERO ENERGY CORPORATION~~ PETROLEA OIL CO, ITS SUBSIDIARIES AND AFFILIATES, AS WELL AS THE OFFICERS, DIRECTORS, EMPLOYEES, AND AGENTS OF EACH OF THEM (COLLECTIVELY, THE "VALERO INDEMNIFIED PARTIES"), HARMLESS FROM AND AGAINST ANY CLAIM, CAUSE OF ACTION, COST, DAMAGE, EXPENSE, FINE, JUDGMENT, LIABILITY, OR PENALTY OF ANY KIND OR NATURE WHATSOEVER (INCLUDING ATTORNEYS FEES AND COST OF COURT OR ARBITRATION)(COLLECTIVELY, THE "COSTS") INCURRED AS A RESULT OF ANY CLAIM, ACTION, PROCEEDING, OR RULING EITHER BROUGHT BEFORE OR IMPOSED BY ANY U.S. JUDICIAL, REGULATORY, ADMINISTRATIVE, OR GOVERNMENT AUTHORITY THAT MAY ARISE AS A RESULT OF OWNER'S BREACH OF THIS SECTION.

**BANKRUPTCY (28 NOV 2011)**

"IN THE EVENT OF A VOLUNTARY OR INVOLUNTARY BANKRUPTCY PETITION, INSOLVENCY, RECEIVERSHIP OR SIMILAR FILING BY OWNERS, THEIR CREDITORS OR OTHERWISE, THE FOLLOWING PROVISIONS SHALL APPLY.  OWNERS AGREE THAT SO FAR AS PERMITTED UNDER APPLICABLE LAW CHARTERERS ARE ENTITLED TO RECOVER POSSESSION OF THE CARGO PROVEN TO BELONG TO CHARTERERS, AS EVIDENCED BY THE PRESENTATION OF AT LEAST ONE ORIGINAL BILL OF LADING, PURSUANT TO THIS CLAUSE AND/OR ADMIRALTY SUPPLEMENTAL RULE D.  OWNERS REMAIN A BAILEE OF THE CARGO, AND AS SUCH ARE OBLIGATED TO SAFELY DISCHARGE SAME INTO CHARTERERS OR ITS AGENT'S CUSTODY, SUBJECT TO THE EVIDENCING OF RIGHTFUL OWNERSHIP PROVIDED ALWAYS AND IN EACH CASE THAT CHARTERERS FIRST PROVIDE A LETTER OF INDEMNITY IN FORM, WORDING AND VALUE ACCEPTABLE TO OWNERS AGAINST ALL LIABILITY, LOSS, DAMAGE, EXPENSE OF WHATSOEVER NATURE ARISING OUT OF OR AS A CONSEQUENCE OF ALLOWING CHARTERERS TO RECOVER POSSESSION OF THE CARGO AND /OR DISCHARGING INTO THE CHARTERERS CUSTODY WITHOUT PRESENTATION OF THE ORIGINAL BILL OF LADING AND/OR OTHERWISE THAN IN ACCORDANCE WITH THE CONTRACTUALLY AGREED VOYAGE. OWNERS SHALL FULLY COOPERATE WITH INSTRUCTIONS AND REQUESTS BY CHARTERERS, SO AS TO AID CHARTERER IN PROMPTLY AND EFFICIENTLY RECOVERING POSSESSION OF ITS CARGO, OR AT CHARTERERS' OPTION, ACCEPTING DELIVERY OF THE CARGO TO CHARTERER AS ORIGINALLY CONTEMPLATED, OR ON A MODIFIED DELIVERY SCHEDULE IF MUTUALLY AGREED TO BY ALL PARTIES IN WRITING. "

**OWNERS CLAUSE:**
--------------
(1)FOR USWC OR ANY OTHER BUNKER'S REGULATED ZONE/CONTROL OF EMISSIONS FROM THE MAIN ENGINE FOLLOWING WILL APPLY:IF VESSEL IS DELAYED TO COMMENCE BERTHING AND DISCHARGE OPERATIONS FOR MORE THAN FOUR CONSECUTIVE DAYS, THEN OWNERS WILL HAVE THE OPTION TO:

A)REQUEST CHARTERERS APPROVAL TO INSTRUCT VESSEL TO ARRIVE AT A SAFE DRIFTING POSITION OUTSIDE OF THE REGULATED ZONE AND TENDER A VALID NOR ON ARRIVAL TO THIS POSITION. (**THE INTENTION IS TO BURN IFO, INSTEAD OF MGO, DUE TO MGO AVAILABILITY IS RESTRICTED ON-BOARD**),

(2) OWNERS ARE CHARTERING THE VESSEL TO "PETROLEA OIL CO" IN GOOD FAITH ASSUMING THERE IS A CLEAR, LEGAL & STANDARD TRADITION OF THE ORIGIN OF THE CARGO TO BE LOADED ON BOARD. ANY DISPUTE BETWEEN SUPPLIERS PDVSA & "PETROLEA OIL CO" AS OF THE TRADITION OF THE CARGO FOR REASON BEYOND OWNERS' CONTROL WILL GIVE OWNERS THE RIGHT TO REMAIN HARMLESS & TO INMEDIATLY TERMINATE THE CP WITHOUT FURTHER OBLIGATIONS.

(3) BIMCO ANTI CRRUPTION CLAUSE ATTACHED


TERMS: EXXONMOBILVOY 2005 WITH VALERO MARKETING AND SUPPLY COMPANY CHARTER PARTY CLAUSES DTD JUNE 26, 2006 AS AMENDED BELOW:

EXXONMOBILVOY 2005

PREAMBLE
---------

PART I (A):

CRUDE OIL WASH (COW) - AFTER "MAXIMUM OF" INSERT 'EIGHT (8) FOR SUEZMAXES AND SIX (6) FOR AFRAMAXES AND PANAMAXES'

DELETE 'CHARTERERS SPEED....LADEN' AND INSERT 'VESSEL TO PERFORM THE LADEN PASSAGE AT 13.0/13.5 KNOTS WEATHER AND SAFE NAVIGATION PERMITTING'

PART II:
---------
CLAUSE 2. (D) LINE 36 - BEFORE 'EXPENSES' INSERT 'DIRECT'

CLAUSE 9. (B) LINES 119/120 - DELETE 'REPLACEMENT COST AT THE PORT WHERE

BUNKERS ARE NEXT TAKEN' INSERT 'ONBOARD COST OF BUNKERS ACTUALLY USED'

CLAUSE 12. LINES 155 AND 158 - DELETE '48' INSERT '24'

CLAUSE 14. (B) DELETE HALF-RATE REPLACE BY FULL-RATE
            (C) LINE 201 - INSERT 'FIRST' BEFORE 'INWARD'
                LINE 206 - DELETE "PORT AUTHORITY"
                      LINE 207 - 208 DELETE
            (E) LINE 240 DELETE FROM 'IF DEMURRAGE' UNTIL THE END OF THE SENTENCE

CLAUSE 15. LINE 244 AT END OF SENTAENCE ADD-'FULL TIME TO COUNT WEATHER PERMITTING OR
NOT FROM WHEN VESSEL TENDER N.O.R. TILL LAST FENDER IS DISCONNECTED AND VESSEL IS FULL
AWAY.

LINE 252 AT END OF SENTENCE ADD 'NO 6 HOURS N.O.R. PRIOR LIGHTERING.'

CLAUSE 18. (C) LINE 337 - ADD AT END 'IF CHARTERERS REQUIRE/INSTRUCT THE VESSEL TO
ARRIVE DE-INSERTED, TIME AND EXPENSES USED FOR RE-INERTING TO BE FOR CHARTERERS'
ACCOUNT WITH EXPENSES TO BE EVIDENCED AS PER FULLY DOCUMENTED CLAIM'

(D) LINE 338 AFTER "VESSEL" INSERT "ALWAYS SUBJECT TO THE SAFETY OF THE VESSEL AND AT
MASTER'S DISCRETION"

(F) LINE 343 - AFTER THE WORDS 'PERIOD OF DISCHARGE' ADD 'EXCLUDING STRIPPING'

CLAUSE 19. DELETE - NOT APPLICABLE FOR THIS CHARTER PARTY

CLAUSE 20. ADD AT END -'ANY TAXES AND/OR DUES ON CARGO ARE TO BE FOR CHARTERERS'
ACCOUNT AND ARE TO BE SETTLED DIRECTLY BY CHARTERERS. ANY TAXES AND/OR DUES ON FREIGHT
ARE TO BE PAID IN ACCORDANCE WITH WORLDSCALE UNLESS VESSEL LOADS IN AUSTRALIA, CHINA,
INDIA, KENYA, TANZANIA, MALAYSIA, PAKISTAN AND/OR PHILIPPINES IN WHICH CASE SUCH TAXES
AND/OR DUES ARE TO BE FOR CHARTERERS' ACCOUNT'

CLAUSE 22. DELETE AS NOT APPLICABLE FOR THIS CHARTER PARTY

CLAUSE 31. ADD 'CHARTERERS AGENTS BOTH ENDS PROVIDED MARKET COMPETITIVE RATES'

CLAUSE 36. LINE 657 - AFTER '90 DAYS' INSERT 'FOR FREIGHT, DEADFREIGHT AND DEMURRAGE
AND 180 DAYS FOR ANY OTHER CHARGES AND/OR EXPENSES'

VALERO MARKETING AND SUPPLY COMPANY CHARTER PARTY CLAUSES DATED JUNE 26, 2006
(ENCLOSED)
AS AMENDED BELOW:
--------------------
1. CHARTER PARTY FORMAT
2. CONTRACT INTERPRETATION
3. CHANGES TO PART II OF THE EXXONMOBILVOY 2005.
A. OK
B. ADD AFTER 'LIGHTERS', "INCLUDING EXTRA PORT COSTS INCLUDING AGENCY FEES
   IF ANY"
C. DELETE VALERO'S AMENDMENT
D. OK
E. OK
F. OK
G. OK
H. OK
I. OK
J. OK
K. OK, BUT REPEAT "OR"
L. OK
M. OK
4. ADHERENCE TO VOYAGE INSTRUCTIONS: ADD AT END 'PROVIDED SAME IS INCLUDED

IN VOYAGE ORDERS.'
5. AG: N/A
6. ASSIGNMENT: ADD AT END 'ALWAYS TO BE APPROVED BY OWNER, WHICH NOT TO BE
   UNREASONABLY WITHHELD.'
7. CARGO OPERATIONS: FIRST LINE DELETE THE WORDS, "ADD DYES" IN SECOND
   PARAGRAPH ADD AT END, "AS PER OWNERS PANDI CUB WORDING."
8. EFFICIENT DEMURRAGE CLAIM PROCESSING (JULY 1, 2002) - OK BUT:
   A- DELETE THE LETTERS "STB"
   B- OK
   C- DELETE
   D- OK
   E- OK
   F- OK
   G- OK
   H- OK
   DELETE LAST SENTENCE AND ADD INSTEAD, "MASTER TO THE BEST OF HIS
   ABILITIES WILL  ENDEAVOR TO COLLECT ALL ABOVE DOCUMENTS AS WELL AS
   HAVE THEM SIGNED WITH AUTHORIZED SIGNATURES. HOWEVER, IF SAME UNOBTAINABLE,
   THEN ALL AVAILABLE DOCUMENTS WILL BE SUBMITTED TO CHARTERERS PRIOR TO TIME
   BAR DATE.
9. EXCESS BERTH OCCUPANCY: AFTER 'SOLEY', INSERT 'AND AS A DIRECT RESULT OF'
10. INDEMNITY
11. INSURANCE: FOR THIS VOYAGE
AT ALL TIMES DURING THE TERM OF THIS CHARTER PARTY, OWNER SHALL MAINTAIN IN FULL FORCE
AND EFFECT, WITH RESPECT TO ITS OPERATIONS AND THAT OF THE CHARTERED VESSEL, THE
FOLLOWING TYPES, AMOUNTS, AND CONDITIONS OF INSURANCE COVERAGE:

A.HULL INSURANCE, INCLUDING COLLISION LIABILITY TO THE FULL VALUE OF THE VESSEL
(UNLESS OTHERWISE INCLUDED IN OWNER'S P&I POLICY); PROTECTION AND INDEMNITY INSURANCE
(S.P. 23 OR EQUIVALENT), INCLUDING POLLUTION COVERAGE IN AN AMOUNT OF AT LEAST U.S.
$1,000,000,000, WITH THE PHRASE "AS OWNER OF THE VESSEL NAMED HEREIN" AND ALL SIMILAR
PHRASES PURPORTING TO LIMIT THE UNDERWRITER'S LIABILITY TO THAT OF AN OWNER, BEING
DELETED; AND WAR RISK ASSOCIATION COVERAGE TO AT LEAST THE FULL VALUE OF THE VESSEL.
DELETE PARA'S B.C.D.E.F.G.H.
12. ITF
13. MARPOL AND CLC:
    AFTER 'IF ANY DELAYS' INS. 'DIRECT'
    AFTER 'ALL APPLICABLE' INS. 'DIRECT'
14. OFAC SDN
15. PAULSBORO/DEL CITY
16. QUESTIONNAIRE AND VESSEL DESCRIPTION:
    AFTER 'VALERO SHIP QUESTIONNAIRE' INSERT 'IF REQUESTED BY CHARTERER'
17. SECURITY REGULATIONS
18. U.S. CUSTOMS AND BORDER PROTECTION REGULATIONS
19. U.S. GULF LIGHTERING WARRANTIES N/A
20. VESSEL EXPERIENCE FACTOR (ARZEW/MEXICO)
    A) OWNERS SHALL COMPLY IF REQUESTED/ APPLICABLE
    B) OWNERS SHALL COMPLY IF REQUESTED/APPLICABLE
21. VGO CLEANING - ADD AT END"THIS CLAUSE IN EFFECT IF PREVIOUS
    CARGO CARRIED IS SUCH THAT CLEANING IS REQUIRED'.


COMMISSION:  1.25 TO CHARTERERS AS ADDRESS ON FRT/DFRT/DEM
             2.50 TO TANKSHIP INTL ON FRT/DFRT/DEM


END.


BRGDS
JOSE PERAZA
TANKSHIP INTERNATIONAL LLC
OFFICE +1 203 3197272
MOBILE +1 203 4348088



**tanker voyage charter party**

**ExxonMobil VOY2005**

## PREAMBLE

| PLACE | DATE |
|-------|------|

IT IS THIS DAY AGREED between _____Owner / Chartered Owner (hereinafter called "Owner") of the_____Flag MS / SS _____ (hereinafter called "Vessel") and _____(hereinafter called "Charterer") that the transportation herein provided for shall be performed subject to the terms and conditions of this Charter, which includes this Preamble and Part I and II. In the event of a conflict, the provisions of Part I will prevail over those contained in Part II to the extent of such conflict.

## PART I

**(A) VESSEL DESCRIPTION AND POSITION:**

Year built:                    Classed:                    IMO#:

Hull Type (as per IOPPC):         P&I Club:                    H&M value:

Summer Deadweight:         Metric tons on         feet/meters in salt water on assigned summer freeboard.

Maximum Cargo Capacity:         Metric tons         % more or less. Vessel's option.

Cubic capacity for cargo (at 98%):         cubic meters / barrels.

Length overall:         feet/meters         Beam:         feet/meters

Inert Gas System:    ❑ Yes    ❑ No

Crude Oil Wash System:         ❑ Yes    ❑ No. If Crude Oil Wash is required, the allowed pumping hours specified in Part II, Clause 18 (g) shall be increased by a maximum of         hours pursuant to Part II, Clause 18 (g).

Vessel has full segregated ballast tanks (SBT):         ❑ Yes    ❑ No

Vessel has clean ballast tanks (CBT):    ❑ Yes    ❑ No

Cargo Tanks Coated:    ❑ Yes    ❑ No    Type:

Cargo Tanks Coiled:    ❑ Yes    ❑ No    Type:

Last cargo:                    Next to last cargo:

Vessel onboard quantity (gross standard volume) on date of Charter:

Vessel location on date of Charter:

Expected ready to load:

Charter speed in all weather:         knots laden.

**(B) LAYDAYS:**         Commencing:         Cancelling:

**(C) LOADING RANGE(S) / PORT(S) / PLACE(S):** One (1) or         safe

**(D)  DISCHARGING RANGE(S) / PORT(S) / PLACE(S):**  One (1) or                    safe

**(E)  CARGO QUANTITY**:

Full Cargo as defined in Part II, Clause 1 subject to the Maximum Cargo Capacity limits specified in Part I(A):  ❑ Yes   ❑ No
or
Part Cargo Minimum                    Metric tons with Charterer's option to load up to Full Cargo as described in this
Paragraph (E); provided Part Cargo Minimum is supplied by Charterer, no deadfreight for Charterer's account whether option
exercised or not.

**(F)  CARGO DESCRIPTION:**

**(G)  FREIGHT RATE:**

Freight rate for Full Cargo or Part Cargo Minimum (hereinafter called "Base Freight Rate"):

Freight rate for quantity above Part Cargo Minimum (hereinafter called "Overage Freight Rate"):

**(H)  BILLING:**

Freight, deadfreight, demurrage and any other monies payable to Owner pursuant to this Charter shall be payable in
United States dollars and invoiced to Charterer at:

and paid to Owner at:

**(I)  LAYTIME:**                    Total Laytime in running hours:

**(J)  DEMURRAGE / DEVIATION PER DAY:**

In accordance with Part II, Clause 8, demurrage and/or deviation per day shall be based on:

Summer deadweight of                              Metric tons
or
Part Cargo Minimum plus                           Metric tons totalling                    Metric tons
or
United States dollars                 per day pro rata

**(K)  SPECIAL PROVISIONS:**

**(L)  INCORPORATED CLAUSE(S):**

The following specified Clause(s), the text(s) of which are attached hereto, shall be deemed incorporated in and made
a part of this Part I.

IN WITNESS WHEREOF, the parties have caused this Charter, consisting of a Preamble, Parts I and II, to be executed in
duplicate as of the day and year first above written.
WITNESS:

_____
Owner

_____        By: _____

WITNESS:

_____
Charterer

_____        By: _____

PART  II

1.  **DEFINITIONS.** In this Charter:                                                                                                1
(a) "place" shall mean any berth, dock, anchorage, sea terminal, submarine line, alongside vessel and/or lighter, whether at anchor or    2
underway, and/or any other place to which Charterer is entitled to order Vessel hereunder.                                            3
(b) "ILL Convention" shall mean the International Load Line Convention, 1966, or any amendment thereof as may be applicable to the    4
voyage(s) to be performed hereunder.                                                                                                5
(c) "Full Cargo" shall mean a cargo which fills Vessel to its minimum freeboard, as permitted by the ILL Convention, or fills the cubic    6
capacity of Vessel's available cargo spaces, whichever occurs first, after leaving appropriate space in the tanks for the expansion of    7
cargo.                                                                                                                               8
(d) "Arrival in Berth" shall mean the completion of mooring of the Vessel when loading or discharging at a sea terminal, Vessel being all    9
fast with gangway down and secure when loading or discharging alongside a wharf/berth or Vessel being all fast alongside a barge,    10
lighter or other vessel when loading from or discharging to a barge, lighter or other vessel.                                        11
(e) Where it is stipulated herein that the Vessel shall meet some "requirement", such stipulation shall be taken to include any requirement    12
that might be placed upon the Owner, operator, and/or personnel of the Vessel.                                                       13
(f)  "Affiliate" shall mean any company which is directly or indirectly owned or controlled, in whole or in part, by Exxon Mobil Corporation.    14
(g) Where it is stipulated herein that notices, advices, consents, approvals and other communications be given, same may, unless otherwise    15
specified herein, be given by electronic mail, telex, facsimile, telephone or radio (if telephone or radio, subsequently confirmed in writing).    16
2.  **VESSEL.**                                                                                                                      17
(a) **DESCRIPTION / CONDITION.** Owner warrants that, from the time when the obligation to proceed to the loading port(s) or place(s)    18
attaches and throughout Vessel's service under this Charter, Vessel shall be as described in Part I (A). Owner further warrants that, during    19
the period just described, Owner shall exercise due diligence to ensure that Vessel and its hull, machinery, boilers, all tanks and all other    20
equipment including, but not limited to, pipes, pumps, valves, inert gas and crude oil wash systems (if Vessel is so equipped), navigational    21
equipment, heating coils and facilities, shall be fully functional and in good working order and condition and in every way seaworthy and fit    22
to carry cargo and perform the voyage(s) required under this Charter.                                                                23
(b) **COMPLEMENT.** Owner warrants that, during the period described in Paragraph (a) of this Clause, Vessel shall have a full and    24
efficient complement of Master, officers and crew, with adequate training and experience in operating all Vessel's equipment, including,    25
but not limited to, inert gas and crude oil wash systems (if Vessel is so equipped), and that Master and all officers shall possess valid    26
and current certificates/documents issued or approved by the country of Vessel's registry. Owner further warrants the conversational    27
English language proficiency of Master and officer(s) in charge of cargo and bunker oil handling.                                    28
(c) **COMPLIANCE.** Owner warrants that Vessel shall, during the period described in Paragraph (a) of this Clause, be in full compliance with    29
all applicable international conventions, all applicable laws, regulations and/or other requirements of the country of Vessel registry and of    30
the countries of the port(s) and/or place(s) to which Vessel may be ordered hereunder and all applicable regulations and/or requirements    31
of any terminals or facilities in such port(s) or place(s) where Vessel shall load or discharge. Owner further warrants that Vessel shall have    32
on board, during the subject period, all certificates, records or other documents required by the aforesaid conventions, laws, regulations    33
and/or requirements.                                                                                                                34
(d) **BREACH.** If any of the warranties stipulated in this Clause are breached, any delay resulting therefrom shall not count as laytime or,    35
if Vessel is on demurrage, as time on demurrage, and any expense attributable to such delay shall be for Owner's account.            36
(e) **SALE.** Owner warrants that the Vessel has not been sold, is not on offer to be sold, and will not be offered for sale during the period    37
of this Charter.                                                                                                                     38
3.  **CLEANING.**                                                                                                                    39
(a) Owner shall clean the tanks, pipes and pumps of Vessel at its expense to the satisfaction of Charterer's representative(s). If the cargo    40
specified in Part I (F) is clean product and inspection of the tanks is required, Owner shall gasfree the tanks as necessary. Any time used    41
for tank inspection and any re-inerting of Vessel shall count as laytime or, if Vessel is on demurrage, as time on demurrage. Any time    42
required for cleaning and gasfreeing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. Compliance with this    43
Clause shall not be deemed compliance with Owner's obligations under Clause 2, which are in no way lessened by this Clause.           44
(b) Vessel shall not be responsible for any admixture, if more than one quality of cargo is shipped, nor for contamination or deterioration    45
in quality of the cargo unless the admixture, contamination or deterioration results from (i) unseaworthiness existing at the inception of    46
loading which was discoverable by the exercise of due diligence or (ii) error or fault of the servants of Owner in the loading, care or    47
discharging of the cargo.                                                                                                           48
(c)  In performing its obligations under this Clause 3, Owner shall comply with the latest ISGOTT guidelines.                         49
4.  **VOYAGE(S).**                                                                                                                   50
(a) Vessel shall proceed with utmost dispatch to any port(s) or place(s) as ordered by Charterer in accordance with Part I (C) and there load    51
a cargo as specified in Part I (E) and (F). On completion of loading, Vessel shall then with utmost dispatch proceed to any port(s) or place(s)    52
as ordered by Charterer in accordance with Part I (D) and there deliver said cargo. Except when required by reason of Vessel fault,    53
lightering within port limits shall be at Charterer's expense.                                                                       54
(b) Owner shall timely transmit Charterer's voyage instructions in their entirety to the Vessel for Master's implementation. Owner shall ensure    55
that Charterer is promptly advised of all accidents to, and/or pollutions involving, the Vessel and of any Vessel system failure.    56
Notwithstanding anything contained in this Charter or in the voyage instructions, the Master and Owner shall continue to be fully and solely    57
responsible for the operation, management and navigation of the Vessel throughout the Vessel's service under this Charter.           58
(c)  Owner warrants that, throughout Vessel's service under this Charter, Owner shall have full and valid Protection and Indemnity    59
Insurance ("P&I Insurance") for the Vessel, as described herein, with the P&I Insurance placed with a P&I Club which is a Member of the    60
International Group of P&I Clubs. This P&I Insurance shall be at no cost to Charterer. The P&I Insurance must include full coverage against    61
liability for cargo loss/damage and coverage against liability for pollution for an amount not less than US $1,000 Million (One Billion    62
Dollars) per incident. If requested by Charterer, Owner shall promptly furnish to the Charterer proper evidence of such P&I Insurance upon    63
signing this Charter or at any time during the Charter term. The above warranty is to be regarded as an essential part of this Charter,    64
which is conditional on its truth or performance, so that its breach entitles the Charterer, in Charterer's option, to terminate the Charter    65
and/or to recover any damages allowable in law.                                                                                     66
5.  **MAXIMUM CARGO.** In no event shall Charterer be required to provide, nor shall Vessel load, a cargo quantity in excess of a Full Cargo.    67
In addition, Charterer shall not be required to provide a cargo quantity in excess of the maximum cargo capacity specified in Part I (A).    68
All time lost and expense incurred by reason of Vessel loading a quantity of cargo which puts Vessel, at any stage of the voyage(s)    69
hereunder, below the marks permissible under the ILL Convention shall be for Owner's sole account.                                   70
6.  **FREIGHT.**                                                                                                                     71
(a) Freight shall be paid at the rate stipulated in Part I (G) and shall be computed on gross quantity as stated on the Bill of Lading and    72
on quantity of documented tank washings if freight thereon is payable in accordance with Clause 33 (a); provided, however, that no freight    73
shall be payable on any quantity of cargo which puts Vessel, at any stage of the voyage(s) hereunder, below the marks permissible under    74

the ILL Convention. Deadfreight shall be paid in accordance with Clause 7. Except as provided in Clause 18 (h), no deduction from freight 75
shall be made for water and/or sediment contained in the cargo, nor for any claim Charterer or cargo interests may have against Owner 76
or Vessel arising under this Charter or Bills of Lading issued for the cargo. Payment of freight shall be made by Charterer without 77
discount upon Charterer's receipt of notice of completion of discharge of cargo at last discharging place less any disbursements made 78
to Master or Owner's agent(s) at port(s) or place(s) of loading and/or discharging plus cost of insurance, commissions and expenses on 79
said disbursements and any other costs incurred by Charterer or Charterer on Owner's behalf pursuant to this Charter. 80

(b) **WORLDSCALE.** Unless otherwise stipulated herein, all rates, hours, terms and conditions in the Worldwide Tanker Nominal Freight 81
Scale current on the date of this Charter (hereinafter called "WORLDSCALE") shall apply to this Charter regardless of when Vessel loads. 82
(c) If cargo is carried between places and/or by a route for which no rate is expressed in WORLDSCALE, then, in the absence of 83
agreement as to the freight rate, the parties hereto will apply to either of the publishers of WORLDSCALE for a binding determination of 84
an appropriate WORLDSCALE rate. 85
(d) Regardless of whether or not the freight specified in Part I (G) is lumpsum, for the purposes of Section 4(5) of the Carriage of Goods 86
by Sea Act of the United States, or the corresponding provisions of any international regime that may otherwise apply in accordance with 87
Clause 27, Owner and Charterer agree that the customary freight unit, shipping unit or unit (as the case may be) of the cargo is Metric ton. 88
(e)  Owner shall deduct in favor of Charterer an address commission of one point five percent (1.25%) from freight, deadfreight, and 89
demurrage payable under this Charter. Owner shall clearly identify such deduction on the freight, deadfreight and/or demurrage invoice. 90

7.      **DEADFREIGHT.** Should the entire cargo quantity specified in Part I (E) not be supplied, Master shall give immediate notice to Charterer 91
that such cargo quantity has not been furnished, indicating shortage, and shall then await Charterer's instructions. Should Charterer fail to 92
provide further cargo, Vessel, upon request of Charterer, shall then proceed on its voyage provided that the tanks in which the cargo is 93
loaded are sufficiently filled to put it in a seaworthy condition. If any delay is caused to Vessel by reason of Master waiting for Charterer's 94
instructions as aforesaid, such delay shall count as laytime or, if Vessel is on demurrage, as time on demurrage and any expense incurred 95
by Vessel attributable solely to such delay shall be for Charterer's account. Deadfreight shall be paid at the Base Freight Rate on the 96
shortage (being the difference between the cargo quantity specified in Part I (E) and the quantity loaded as shown on the Bills of Lading) 97
provided such deadfreight charge is fully documented by cable advice from Master or by deadfreight certificate. Charterer shall be 98
credited with any freight on residues earned by Owner in accordance with Clause 33(a)(iii). 99

8.      **DEMURRAGE / DEVIATION RATE.** The rate for demurrage and/or deviation shall be the fixed dollar figure specified in Part I (J) or the rate 100
derived by determining the applicable rate from the WORLDSCALE Demurrage Table for tonnage specified in Part I (J) and multiplying that 101
rate by the Base Freight Rate. If a Part Cargo Minimum basis is specified in Part I (E) and Charterer exercises its option to load additional 102
cargo, any demurrage and/or deviation shall, nevertheless, remain payable at either the aforesaid fixed dollar rate or at the aforesaid rate 103
based on the tonnage specified in Part I (J), whichever is applicable. The applicable rate under this Clause shall hereinafter be called 104
"Demurrage Rate" or "Deviation Rate" as is appropriate. 105

9.      **LOADING AND DISCHARGING PORT(S) / PLACE(S).** 106
(a) Charterer shall nominate loading or discharging port(s) and/or place(s) or order Vessel to a destination for orders. If Vessel is ordered 107
to a destination for orders, Charterer shall thereafter nominate loading or discharging port(s) and/or place(s). All such nominations or 108
orders shall be made in sufficient time to avoid delay to Vessel. 109
(b) **CHANGE OF DESTINATION.** After nominating loading and/or discharging port(s) or place(s) pursuant to Paragraph (a) of this Clause, 110
Charterer may nominate new port(s) or place(s), whether or not they are within the range of the previously nominated port(s) or place(s) 111
and/or vary the rotation of any nominated port(s) or place(s) and Owner shall issue instructions necessary to make such change(s). It is 112
understood and agreed, however, that the aforesaid option to nominate new loading port(s) or place(s) in different ranges shall lapse on 113
Vessel tendering Notice of Readiness at a nominated loading port or place and that aforesaid option to nominate new discharging port(s) 114
or place(s) in different ranges shall lapse on Vessel tendering Notice of Readiness at a nominated discharging port or place. If a change 115
to, or varying the rotation of, nominated port(s) or place(s) occurs or if Vessel is sent to a destination for orders, any time by which the 116
steaming time to the port(s) or place(s) is finally ordered exceeds that which would have been taken if Vessel had been 117
ordered to proceed to such port(s) or place(s) in the first instance shall be compensated at the Deviation Rate per running day and pro 118
rata for a part thereof. In addition, Charterer shall pay for extra bunkers consumed during such excess time at Owner's documented 119
actual replacement cost at the port where bunkers are next taken. 120
(c) Any order of Vessel to a destination for orders, all nominations and any renominations pursuant to this Clause shall be consistent with 121
Part I (C) and (D). 122

10.     **ESTIMATED TIME OF ARRIVAL (ETA).** 123
(a) Unless otherwise instructed, the following Estimated Time of Arrival (ETA) notifications shall be given. As soon as commencing the 124
voyage to the nominated loading port(s) or place(s), but in no event later than seventy-two (72) hours prior to the commencement of 125
laydays specified in Part I (B), Master shall advise Charterer and Vessel's agent and terminal of Vessel's estimated date and time of arrival 126
at the nominated loading port(s) or place(s). Further, provided the length of the voyage permits, Master shall confirm or amend such advice 127
seventy-two (72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the loading port(s) or place(s). On leaving the final 128
loading port or place, Master shall advise Charterer and Vessel's agent of Vessel's estimated date and hour of arrival at the nominated 129
discharging port(s) or place(s). Further, provided the length of the voyage permits, Master shall confirm or amend such advice seventy-two 130
(72), forty-eight (48) and twenty-four (24) hours prior to Vessel's arrival at the discharging port(s) or place(s). In addition, on leaving the final 131
loading port or place, Master shall advise Charterer of expected maximum draft at arrival and, provided the length of voyage permits, 132
shall confirm or amend such advice no later than seventy-two (72) hours prior to Vessel's arrival at the discharging port(s) or place(s). 133
(b) An alteration of more than three (3) hours in the twenty-four (24) hour notice or an alteration of more than twelve (12) hours in any 134
other advice given pursuant to Paragraph (a) of this Clause shall be advised by Master to Charterer and Vessel's agent. 135
(c) If, for any reason, Vessel is unable to trim to even keel for arrival at the discharging port(s) or place(s), Master shall give notice of this 136
to Charterer as soon as possible after receiving such loading instructions but no later than sailing from the final loading port or place. 137
Such notice shall include Vessel's estimated arrival draft forward and aft. 138
(d) If Master fails to comply with the requirements of Paragraphs (a), (b) and/or (c) of this Clause, any delay resulting therefrom at loading 139
and/or discharging port(s) or place(s) shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. 140
(e) At each loading and discharging port or place, Master or Vessel's agent shall promptly notify Charterer of the dates and times the 141
following events occurred: 142
- Notice of Readiness to load/discharge tendered; 143
- All fast; 144
- Hoses connected; 145
- Hoses disconnected; 146
- All cargo documents on board; and 147
- Vessel sailed. 148

11.     **NOTICE OF READINESS.** Upon arrival at customary anchorage or waiting place at each loading and discharging port or place, Master 149

or Vessel's agent shall give Charterer or its representative notice that Vessel is in all respects ready to load or discharge cargo, berth or no berth. At each load port or place, the Vessel shall be fully bunkered for the intended voyage and the Notice of Readiness shall, without limitation, confirm such bunkering.

12.  **CANCELLATION OF CHARTER.** If Vessel has not tendered a valid Notice of Readiness ("NOR") by 1600 hours local time on the Cancelling Date specified in Part I (B) ("Cancelling Date"), Charterer shall have the right to cancel this Charter by notifying Owner or Owner's agent of such cancellation within forty-eight (48) hours local time after expiration of the said Cancelling Date, failing which this Charter shall remain in full force and effect; in which case, laytime shall commence no earlier than forty-eight (48) hours after the tender of NOR or on the commencement of loading, whichever occurs first. Charterer's cancellation option shall continue to apply even if Vessel tenders NOR within the forty-eight (48) hour period after expiration of the Cancelling Date. However, if Vessel is delayed by reason of Charterer's change of orders pursuant to Clause 9 and/or by ice risks as stipulated in Clause 21, the Cancelling Date shall be extended, with the option of cancellation as aforesaid, by any time so directly lost. Cancellation or failure to cancel shall be without prejudice to any claims for damages Charterer may have for late tender of Vessel's services.

13.  **LAYTIME / DEMURRAGE.**
(a) **COMMENCEMENT / RESUMPTION.** Laytime or time on demurrage, as herein provided, shall commence or resume upon the expiration of six (6) hours after receipt by Charterer or its representative of Notice of Readiness or upon Vessel's Arrival in Berth, whichever occurs first. Laytime shall not commence before 0600 hours local time on the Commencing Date specified in Part I (B) unless Charterer shall otherwise agree, in which case laytime shall commence upon commencement of loading.
(b) **EARLY LOADING.** In the event Charterer agrees to load Vessel prior to commencement of laydays, laytime will begin at commencement of loading and the amount of time from commencement of loading until 0600 hours local time on the commencing date specified in Part I (B), shall be added to the laytime specified in Part I (I).
(c) **DURATION.** The laytime specified in Part I (I) shall be allowed free of expense to Charterer for the purpose of loading and discharging cargo and all other Charterer's purposes. Laytime or, if Vessel is on demurrage, time on demurrage, shall continue until all cargo hoses have been completely disconnected upon the final termination of the loading or discharging operation. Disconnection of all cargo hoses shall be promptly effected. If Vessel is delayed in excess of two (2) hours after such disconnection of cargo hoses solely for Charterer's purpose, laytime or, if Vessel is on demurrage, time on demurrage shall resume upon the expiration of said two (2)-hour period and shall continue from that point until the termination of such delay.
(d) **PAYMENT.** Charterer shall pay demurrage per running day and pro rata for a part thereof for all time by which the allowed laytime specified in Part I (I) is exceeded by the time taken for loading and discharging and for all other Charterer's purposes and which, under this Charter, counts as laytime or as time on demurrage.

14.  **LAYTIME / DEMURRAGE CONSEQUENCES.**
(a) **SPECIFIED.** Any delay to Vessel after the expiration of six (6) hours from receipt of Notice of Readiness before Arrival in Berth or any delay to Vessel after Arrival in Berth, due to unavailability of berth (prior to Arrival in Berth), unavailability of cargo, or solely for Charterer or terminal purposes, shall count as laytime or, if Vessel is on demurrage, as time on demurrage.
(b) **HALF-RATE DEMURRAGE.** If demurrage is incurred and the Vessel has been delayed in berthing, loading and/or discharging (hereinafter in this Paragraph (b) called "Delay") due to: weather and/or sea conditions; fire; explosion; strike, picketing, lockout, slowdown, stoppage or restraint of labor; breakdown of machinery or equipment in or about the facilities of Charterer, supplier, shipper or consignee of the cargo (hereinafter in this Paragraph (b) separately and jointly called "Listed Conditions"), be the Delay prior to or after the expiration of laytime, that span of time on demurrage equal to the period or periods of Delay as just described shall be paid at half of the Demurrage Rate. If, during a period of Delay, Listed Conditions co-existed, along with any of the other conditions described in Paragraph (a) of this Clause 14, the Listed Conditions shall conclusively be deemed to be sole cause of the Delay, either if they caused the Delay independently of the other conditions or could have caused the Delay if the other conditions had not so co-existed. Weather and/or sea conditions shall include, but not be limited to, lightning, restricted visibility (the term "restricted visibility" shall mean any condition in which visibility is restricted by fog, mist, falling snow, ice, heavy rainstorms, sandstorms and any other similar causes), storm, wind, waves and/or swells. The provisions of Paragraph 14(b) shall apply irrespective of any option given in Part I (C) and (D). The foregoing provisions as to payment of half the Demurrage Rate in respect to weather and/or sea conditions shall not apply where the Vessel is lightered or discharged at sea.
(c) **EXCLUSIONS.** *Notwithstanding the provisions of any other Paragraph of this Clause or any other Clause of this Charter to the contrary, time shall not count as laytime or, if Vessel is on demurrage, as time on demurrage, if such time is spent or lost:*
        (i) As a result of labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor involving Master, officers or crew of Vessel or tugboats or pilots unless, in the case where Charterer has load/discharge port options, a labor dispute, strike, go slow, work to rule, lockout, stoppage or restraint of labor of tug boats or pilots, is in force at the port at the time Charterer nominated such port;
        (ii) On an inward passage, including, but not limited to, awaiting daylight, tide, tugs or pilot, and moving from anchorage or other waiting place, even if lightering has taken place at the anchorage or other waiting place, until Vessel's Arrival in Berth;
        (iii) Due to overflow, breakdown, inefficiency, repairs, or any other conditions whatsoever attributable to Vessel, Master, officers, crew and/or Owner, including inability to load or discharge the cargo within the time allowed and/or failure to meet Vessel warranties stipulated in this Charter;
        (iv) Due to Owner or port authority prohibiting loading or discharging;
        (v) By reason of local law or regulations, action or inaction by local authorities (including, but not limited to, Port, Coast Guard, Naval, Customs, Immigration and/or Health authorities), with the exception, however, of port closure due to weather and/or sea conditions;
        (vi) In ballasting or deballasting, lining up and/or draining of pumps/pipelines, cleaning of tanks, pumps, pipelines, bunkering or for any other purposes of the Vessel only, unless same is carried out concurrent with loading and/or discharging so that no loss of time is involved; or
        (vii) Due to an escape or discharge of cargo and/or pollutant substances (herein after called "pollutants") or the threat of an escape or discharge of pollutants on or from Vessel. (The phrase "threat of an escape or discharge of pollutants" shall for the purposes of this paragraph (vii) mean a grave and imminent danger of the escape or discharge of pollutants which, if it occurred, would create a serious danger of pollution damage).
(d) **OTHER REFERENCES.** Laytime and demurrage references are also contained in the following Clauses:

| Clause: | | |
|---|---|---|
| 2 (d) | Vessel-Breach | |
| 3 (a) | Cleaning | |
| 5 | Maximum Cargo | |
| 7 | Deadfreight | |
| 8 | Demurrage/Deviation Rate | |
| 10 (d) | Estimated Time of Arrival (ETA) | |
| 13 | Laytime/Demurrage | |
| 15 (b) and (c) | Lightering/Cargo Advisor | |
| 16 (c) and (d) | Shifting and Off Berth | |

| 17 (d) | Cargo Measurement | 226 |
|--------|-------------------|-----|
| 18 (a) (c) (D) (f) and (g) | Pumping In and Out | 227 |
| 19 | Back Loading | 228 |
| 21 (b) | Ice-At Port | 229 |
| 22 | Dry Cargo | 230 |
| 23 | Quarantine | 231 |
| 24 (b) | Inspection-Bunker Sampling | 232 |
| 25 | Heat | 233 |
| 27 (c) | Bills of Lading | 234 |
| 29 (b) | Exceptions | 235 |
| 33 (a) | Clean Seas-Handling of Tank Washings | 236 |
| 36 | Waiver of Claims | 237 |

(e) **UNSPECIFIED.** Any delays for which laytime/demurrage consequences are not specifically allocated in this or any other Clause of this Charter and which are beyond the reasonable control of Owner or Charterer shall count as laytime or, if Vessel is on demurrage, as time on demurrage. If demurrage is incurred, on account of such delays, it shall be paid at half the Demurrage Rate.

15. **LIGHTERING / CARGO ADVISOR.**

(a) Any partial lightering or lightering to extinction, at sea or at a place outside a port, shall be conducted in accordance with the latest OCIMF guidelines for ship-to-ship transfers and with port authority approval, if applicable.  The Vessel shall not lighter, either partially or to extinction, as just described, without prior consent or specific request from Charterer.

(b) Where lightering is requested by Owner or required by reason of fault attributable to Vessel, all expense and time related to the lightering shall be for the account of the Owner, irrespective of any consent from Charterer.

(c) Any lightering, at sea or at a place outside a port, except as described in subparagraph (b), shall be at the expense of Charterer and, notwithstanding Clauses 11, 13 (a) and 14 (a) and (b), time used for such lightering shall count as laytime or as time on demurrage, as provided below:

(i) If Vessel is partially lightered at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall commence when Vessel arrives at the lightering site designated by Charterer and shall end when disconnecting of the cargo hoses from the last cargo receiving vessel has been completed.

(ii) If Vessel is lightered to extinction at sea or at a place outside a port, laytime or, if Vessel is on demurrage, time on demurrage shall commence upon the expiration of six (6) hours after Vessel arrives at the lightering site designated by Charterer or when Vessel is all fast alongside the first cargo receiving vessel, whichever occurs first, and end when disconnection of the cargo hoses from the last cargo receiving vessel has been completed.

(d) If Vessel is lightered to extinction at sea, freight payment shall, in the absence of agreement as to the appropriate freight rate, be based on the freight rate stipulated in Part I (G) multiplied by a flat rate which shall be obtained from the Worldscale Association (London) Limited or the Worldscale Association (NYC) Inc. If Vessel is partially lightered at sea, the lightering site shall not constitute a port or place additional to those specified in Part I (D) and the freight rate for the voyage shall be the same as if the lightering had not taken place. Charterer, however, shall reimburse Owner for any time by which the steaming time to the final discharging port or place exceeds that which would have been taken if Vessel had not lightered at the Deviation Rate per day or pro rata for a part thereof. In addition, Charterer shall pay for extra bunkers consumed by Vessel during such excess time at Owner's documented actual replacement cost at the port where bunkers are next taken.

(e) With respect to any loading or discharging in port or at sea, Charterer may, at its option and cost, place on the Vessel one or more cargo advisors to monitor the loading, lightering and/or discharge of cargo and, if applicable, the inert gas and/or crude oil washing. It is understood and agreed however, that the Master and Owner shall continue to be fully and solely responsible for the operation, management and navigation of Vessel during the entire loading, lightering and/or discharging operation.

16. **LOADING / DISCHARGING PLACE.**

(a) Vessel shall not be required to berth where the maximum draft of Vessel is greater than the depth of water at low tide. In such cases, Charterer undertakes to discharge sufficient cargo into vessels and/or lighters within port limits to enable Vessel to safely reach and lie at berth always afloat.

(b) **SAFE LOCATION(S).** Charterer shall exercise due diligence to order Vessel to port(s) or place(s) which are safe for Vessel and where it can lie always safely afloat. Notwithstanding anything contained in this or any other Clause in this Charter to the contrary, Charterer shall not be deemed to warrant the safety of any such port(s) or place(s) and shall not be liable for any loss, damage, injury or delay resulting from any unsafe condition at such port(s) or place(s) which could have been avoided by the exercise of reasonable care on the part of the Master or Owner. The term "safe", as used in Part I (C) and (D), shall be construed to be consistent with Charterer's obligation as set forth in this Paragraph (b).

(c) **SHIFTING.** Charterer shall have the right to shift Vessel within any port of loading and/or discharging from one loading or discharging place back to the same or to another such place once or more often. In the event that Charterer exercises this right, Charterer shall pay all additional expenses properly incurred, including additional Bunkers. Time spent shifting shall count as laytime or, if Vessel is on demurrage, as time on demurrage. For purposes of freight payment, the places grouped in port and terminal combinations in WORLDSCALE are to be considered as berths within a single port, with Charterer paying shifting expenses in accordance with the foregoing.

(d) **OFF BERTH.** Charterer or terminal operator shall have the right to shift Vessel from a loading and/or discharging place if Vessel fails to meet the pumping and/or heating warranties stipulated in Clauses 18 and 25 so as to avoid delay to other vessels waiting to use such place. Charterer or terminal operator shall also have the right to shift Vessel from a loading and/or discharging place due to an unsafe condition of Vessel or failure of Vessel to meet the warranties of Clauses 2(a), (b) and/or (c). In such situation(s), Charterer shall not be obliged to provide an alternative loading or discharging place to the place from which Vessel was shifted. However, Charterer shall exercise due diligence to arrange prompt reberthing and commencement of loading or discharging once Vessel has corrected deficiency(ies). All expenses related to this shifting and any reberthing shall be for Owner's account and all time lost by reason of the foregoing shall not count as laytime or, if Vessel is on demurrage, as time on demurrage. An Off Berth reference is also contained in Clause 24 (b).

17. **CARGO MEASUREMENT.**

(a) Prior to loading, Master shall measure the on board quantities of cargo, water and sediment residues which are segregated in all holding tanks and slop tanks and those which remain in cargo tanks and, if requested, shall advise supplier(s) and Charterer of such quantities. After loading, Master shall determine the cargo quantities loaded, expressing these cargo quantities in barrels at standard temperature (60°F), using for such calculations the latest Manual of Petroleum Measurement Standards issued by the American Petroleum Institute (API MPMS) or similar standards issued by the American Society for Testing and Materials. A written tank-by-tank ullage report containing all measurements of oil, water and sediment residues on board prior to loading and quantities of cargo loaded shall be prepared and promptly submitted by Master to Charterer.

(b) If Master's calculations of cargo loaded (oil, water and sediment residues on board excluded), after applying the Vessel's Experience

Factor (VEF), show any deficiency from the Bill of Lading figures, Master shall, if investigation and recalculation verify such deficiency, issue 302
a Letter of Protest to supplier(s) (which should, if practical, be acknowledged) and shall advise Charterer of such deficiency immediately 303
and thereafter shall send a copy of the Letter of Protest to Charterer. Vessel shall have on board sufficient historical information for the 304
calculation of a VEF using the latest edition of the API MPMS. Master shall calculate and apply the VEF as so determined during all 305
loadings. 306

(c) Prior to discharging, Master shall measure the quantity of each grade of cargo on board, expressing these quantities in barrels at 307
standard temperature (60°F), using the same calculation procedures specified in Paragraph (a) of this Clause. Before and after discharging, 308
Master shall cooperate with shore staff to ascertain discharged quantities. Vessel shall be obliged to discharge all liquid cargo and, if 309
ordered by Charterer, any residues of cargo, water and sediment. Vessel's just-mentioned obligation shall not in any way be qualified or 310
limited by any purported custom of the trade which is based on a stated in-transit loss or which otherwise would excuse Vessel from 311
discharging all liquid cargo and residues. 312

(d) An inspector may be employed by Charterer at its expense to verify quantities and qualities of cargo and residues on board Vessel at 313
both loading and discharging port(s) and/or place(s). If Vessel is equipped with an Inert Gas System, depressurization of tanks to permit 314
ullage measurements shall be allowed in accordance with the provisions of the most recent Inert Gas Systems for Oil Tankers publication 315
issued by the International Maritime Organization (IMO). Any time used solely for such inspections and/or measurements shall count as 316
laytime or, if Vessel is on demurrage, as time on demurrage. 317

18.   **PUMPING IN AND OUT.** 318

(a) Hoses for loading and discharging shall be furnished by Charterer and shall be connected and disconnected by Charterer or by Owner, 319
at Charterer's option. When Vessel loads and/or discharges at sea terminal(s), Vessel shall be properly equipped, at Owner's expense, 320
for operations at such terminal(s), including suitable anchors, ground tackle, mooring lines and equipment for handling submarine hoses. 321
Vessel shall also be properly equipped with a sufficient number of cargo manifold reducing pieces of steel or comparable material 322
(excluding aluminum and gray cast iron) which meet the most recent Oil Companies International Marine Forum (OCIMF) standards, to 323
make available appropriate flanges for cargo hoses/arms at all manifold connections on one side of Vessel. If Vessel is not properly 324
equipped as required in this Paragraph (a), any time thereby lost shall not count as laytime or, if Vessel is on demurrage, as time on 325
demurrage. 326

(b) The cargo shall be pumped into Vessel at the expense and risk of Charterer only up to Vessel's permanent hose connections. The 327
cargo shall be discharged from Vessel at the expense and risk of Owner only up to Vessel's permanent hose connections. Vessel shall 328
provide all necessary pumps, power, and hands required on board for mooring and unmooring, connecting and disconnecting of hoses 329
and loading and discharging. If requested by Charterer, Vessel shall load and/or discharge more than one grade simultaneously if Vessel 330
is technically capable of doing so. 331

(c) Owner warrants that Vessel shall arrive at the loading place(s) with cargo tanks properly inerted and that such tanks shall so remain 332
inerted throughout the loading of the cargo, the voyage and the subsequent discharging of the cargo. In case of an Inert Gas System 333
failure during loading and/or discharging, cargo operations shall be suspended immediately until the System becomes fully operational, 334
any deficiency in inerting is fully corrected and the terminal (or other loading and/or discharging facility) has given permission to resume 335
operations. Time used from cessation to resumption of cargo operations shall not count as laytime or, if Vessel is on demurrage, as time 336
on demurrage. 337

(d) If required by Charterer, Vessel, after loading or discharging, shall clear shore pipelines of cargo by pumping water through them and 338
the time thereby consumed shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 339

(e) All overtime incurred by officers and crew in loading and/or discharging shall be for the account of Owner. 340

(f) Vessel shall load at rates requested by Charterer having due regard for the safety of Vessel. Owner warrants that Vessel shall discharge 341
entire cargo (be it one or more grades) within twenty-four (24) hours pumping time or maintain the maximum safe psi pressure at Vessel's 342
rail that the Vessel can discharge at, but always at a minimum of 100 psi, during the entire period of discharge provided shore facilities 343
permit. All time lost as a result of Vessel being unable to discharge its cargo in accordance with the pumping warranty above shall not 344
count as laytime or, if Vessel is on demurrage, as time on demurrage. If the terminal or place of discharging does not allow or permit Vessel 345
to meet the above warranty or requires discharging grades consecutively, Master shall forthwith issue a Letter of Protest (which should, 346
if practical, be acknowledged) to such terminal or place and shall immediately advise Charterer. If Master fails to issue the Letter of 347
Protest, Owner shall be deemed to waive any rights to contest that time was lost as a result of Vessel's failure to comply with the above 348
pumping warranty. Any pumping time lost solely due to restrictions imposed by the terminal or place of discharging shall count as laytime 349
or, if Vessel is on demurrage, as time on demurrage. 350

(g) Charterer shall have the right to require Vessel, if it is so equipped, to Crude Oil Wash the cargo tanks and, in such case, the allowed 351
pumping hours (i.e. the twenty-four (24) hours of pumping time specified in Paragraph (f) of this Clause or the number of pumping hours 352
taken to discharge the entire cargo when Vessel maintains the applicable rail pressure in accordance with Paragraph (f) of this Clause, 353
whichever is applicable) shall be increased by the maximum hours specified in Part I (A) for Crude Oil Wash operations. If less than all of 354
the tanks are washed, the said maximum hours shall be prorated on the basis of the number of tanks washed to the total number of 355
cargo tanks and the hours resulting from such proration shall be added to the allowed pumping hours. If Crude Oil Wash is not conducted, 356
Charterer shall have the right to require Vessel to remain at berth for clingage rundown or other cargo recovery technique. The time for 357
such clingage rundown or other cargo recovery technique shall not exceed ten (10) hours and the time so used shall count as laytime 358
or, if Vessel is on demurrage, as time on demurrage. 359

(h) In the event that any liquid cargo remains on board at completion of discharge for the final voyage under this Charter, then Charterer 360
shall have the right to deduct from freight an amount equal to the Free On Board (FOB) port of loading value of such cargo plus freight due 361
with respect thereto. The quantity and quality of such liquid hydrocarbon material shall be determined by a mutually agreeable 362
independent cargo inspector. The quantity of Remaining On Board (ROB) material shall be measured using the Vessel's wedge tables, if 363
available, or otherwise by wedge formula. 364

19.   **BACK LOADING.** Charterer shall have the option of loading Vessel with a part cargo at any discharging port or place to which Vessel 365
may have been ordered, provided that such part cargo is as described in Part I (F) and is compatible with cargo then on board. Owner 366
shall discharge such part cargo at any other discharging port(s) or place(s) previously nominated, provided such port(s) or place(s) lie 367
within the rotation of the discharging ports or places previously nominated. If this option is exercised, additional time consumed awaiting berth and/or cargo 368
and/or tank preparation and/or loading and discharging such part cargo shall count as laytime or, if Vessel is on demurrage, as time on 369
demurrage. Any additional expenses, including port charges, incurred as sole result of loading and discharging such part cargo shall be 370
for Charterer's account. 371

20.   **DUES, TAXES AND OTHER CHARGES.** 372

(a) Unless otherwise specified in WORLDSCALE and to the extent not prohibited by law, dues, taxes and other charges upon Vessel 373
(including those assessed on the quantity of cargo loaded or discharged or on the freight) shall be paid by Owner and dues, taxes and 374
other charges on the cargo shall be paid by Charterer. Vessel shall be free of charges for the use of any place(s) arranged by Charterer 375
solely for the purpose of loading or discharging cargo. However, Owner shall be responsible for charges for any such place(s) when used 376
solely for Vessel's purposes, such as, but not limited to, awaiting Owner's orders, tank cleaning, repairs, before, during or after loading 377

and/or discharging. 378

(b) Notwithstanding the provisions of Clause 20(a), dockage and wharfage shall be deemed included in the freight rate specified in Part I (G). 379

21. **ICE.** 380

(a) **DURING VOYAGE.** In case a nominated port or place of loading or discharging should be inaccessible due to ice, Master shall 381 immediately notify Charterer, requesting revised orders and shall remain safely outside the ice-bound area. Charterer shall give orders for 382 another port or place which is free from ice and where there are facilities for the loading or discharging of the cargo in bulk. In this event, 383 freight shall be paid at the rate stipulated in Part I (G) from or to such alternate port or place and any time by which the steaming time 384 from or to such port or place exceeds that which would have been taken if the Vessel had been ordered to proceed from or to such port 385 or place in the first instance shall be compensated at the Deviation Rate per running day and pro rata thereof. In addition, Charterer shall 386 pay for extra bunkers consumed during such excess time at Owner's documented actual replacement cost for such bunkers at the port 387 where bunkers are next taken. 388

(b) **AT PORT.** If, on or after Vessel's arrival at the loading or discharging port or place, it is dangerous to remain at such port or place for 389 fear of Vessel being frozen-in or damaged, Master shall notify Charterer who shall give orders for Vessel either to proceed to another port 390 or place where there is no danger of ice and where there are facilities for the loading or discharging of the cargo in bulk or to remain at 391 such original port or place at Charterer's risk. If Vessel is ordered to proceed to another port or place, the sum in respect of freight and 392 delay to be paid by Charterer shall be as stipulated in Paragraph (a) of this Clause. If Vessel remains at such original port or place, any 393 time so lost on account of ice shall count as laytime or, if Vessel is on demurrage, as time on demurrage. 394

22. **DRY CARGO.** Charterer has the option of shipping packaged and/or general cargo (including oils and bitumen in drums) in the available 395 dry cargo space. Freight shall be payable on such cargo in accordance with Clause 6 at the Base Freight Rate and Charterer shall pay, 396 in addition, all expenses, including port dues, incurred solely as a result of the packaged and/or general cargo being carried. The time 397 used loading and discharging such dry cargo shall count as laytime or, if Vessel is on demurrage, as time on demurrage, but only to the 398 extent that such time is not concurrent with time used loading and/or discharging the liquid cargo carried hereunder. 399

23. **QUARANTINE.** Time lost at any port or place due to quarantine shall not count as laytime or, if Vessel is on demurrage, as time on 400 demurrage unless such quarantine was in force at the time when such port or place was nominated by Charterer. 401

24. **INSPECTION.** 402

(a) **OPERATIONS/INCIDENTS.** Charterer's representative(s) shall have the right at loading and/or discharging port(s) or place(s) to 403 inspect Vessel and observe operations. Charterer's representatives shall also have the right to attend on board the Vessel to ascertain 404 the circumstances of any incident involving cargo carried hereunder. Owner shall instruct Master to give every assistance so as to enable 405 said representative(s) to properly observe operations throughout Vessel and to ascertain any incident circumstances. 406

(b) **BUNKER SAMPLING.** Charterer's representative(s) shall have the right to survey and take samples of all Vessel's bunker tanks and 407 non-cargo spaces. Refusal by Master to permit such bunker surveying and sampling shall give Charterer or terminal operator the right 408 to order Vessel off berth. All time lost by reason of such refusal, including any time used in shifting Vessel off and back to berth, shall not 409 count as laytime or, if Vessel is on demurrage, as time on demurrage. Further, all expenses related to such refusal, including Vessel shifting 410 expenses, shall be for Owner's account. Any delay to Vessel caused solely by bunker surveying and sampling shall count as laytime or, 411 if Vessel is on demurrage, as time on demurrage. 412

25. **HEAT.** If Vessel is described as coiled in Part I (A), Owner warrants that Vessel is capable of heating the cargo up to and maintaining it 413 at a maximum temperature of 135°F/57°C. However, unless otherwise requested by Charterer, Vessel shall only be required to maintain 414 the cargo at the temperature loaded (up to a maximum of 135°F/57°C) throughout the voyage and the entire discharge. If requested by 415 Charterer and if the length of the voyage allows, Vessel shall increase and maintain the temperature of the cargo from the loaded 416 temperature to a temperature specified by Charterer, up to a maximum of 135°F/57°C, and Charterer shall pay for extra bunkers 417 consumed solely in increasing the temperature as aforesaid at Owner's documented actual replacement cost for such bunkers at the 418 port where bunkers are next taken. If Vessel fails to maintain the loaded temperature or to increase and maintain the temperature of the 419 cargo, as requested by Charterer, Charterer shall have the option to hold Vessel off berth and/or to suspend discharging, all until the 420 cargo is properly heated, all time and expense in connection with the foregoing being for Owner's account. 421

26. **BUNKERS.** When, in connection with the performance of any voyage provided for in this Charter, Owner plans to purchase bunkers at any 422 port(s) outside the United States or its territories, Owner shall purchase the bunkers from Charterer or its designated Affiliate(s) whenever 423 they are so available at competitive prices. In the event lower prices are quoted to Owner by any supplier at the port(s) in question, Owner 424 shall give Charterer or its designated Affiliate(s) the opportunity to meet such quotation. 425

27. **BILLS OF LADING.** 426

(a) Bills of Lading shall be signed by Master as presented, Master attending daily, if required, at the offices of Charterer or its agents. 427 However, at Charterer's option, Charterer or its agents may sign Bills of Lading on behalf of Master. All Bills of Lading shall be without 428 prejudice to this Charter and Charterer shall indemnify Owner against all consequences or liabilities which may arise from any 429 inconsistency between this Charter and any Bills of Lading or other documents signed by Charterer or its agents or by Master at their 430 request or which may arise from an irregularity in papers supplied by Charterer or its agents. 431

(b) Notwithstanding anything in this Charter to the contrary, the carriage of cargo under this Charter and under all Bills of Lading issued 432 for the cargo shall be subject to the statutory provisions and other terms set forth or specified in sub-paragraphs (i) through (vi) of this 433 Clause and such terms shall be incorporated verbatim or be deemed incorporated by reference in any such Bill of Lading. In such 434 sub-paragraphs and in any Act referred to therein, the word "Carrier" shall include Owner and Chartered Owner of Vessel. 435

(i) **CLAUSE PARAMOUNT.** This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods By Sea Act 436 of the United States, approved April 16, 1936, except that if this Bill of Lading is issued at a place where any other Act, ordinance or 437 legislation gives statutory effect to: (i) the International Convention for the Unification of certain Rules relating to Bills of Lading at Brussels, 438 August 1924 ("Hague Rules"), or (ii) the Hague Rules as amended by the Protocol signed at Brussels, February 1968 ("Hague/Visby Rules"), 439 or (iii) the United Nations Convention on the Carriage of Goods by Sea 1978 ("Hamburg Rules"), then this Bill of Lading shall have effect 440 subject to the provisions of such Act, ordinance or legislation. The applicable Act, ordinance or legislation (hereinafter called "Act") shall 441 be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or 442 immunities or an increase of any of its responsibilities or liabilities under the Act. If any term of this Bill of Lading be repugnant to the Act 443 to any extent, such term shall be void to that extent but no further. 444

(ii) **JASON CLAUSE.** In the event of accident, danger, damage or disaster before or after the commencement of the voyage, 445 resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not 446 responsible, by statute, contract or otherwise, the cargo shippers, consignees or owners of the cargo shall contribute with the Carrier in 447 General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and 448 shall pay salvage and special charges incurred in respect of the cargo. If a salving ship is owned or operated by the Carrier, salvage shall 449 be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem 450 sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the 451 cargo shippers, consignees or owners of the cargo to the Carrier before delivery. 452

(iii) **GENERAL AVERAGE.** General Average shall be adjusted, stated, and settled according to the York Antwerp Rules 2004 453

("Rules") and, as to matters not provided for by those Rules, according to the laws and usages at the port of New York; provided that, when there is an actual escape or release of oil or pollutant substances from the Vessel (irrespective of Vessel location), the cost of any measures, continued or undertaken on that account, to prevent or minimize pollution or environmental damage shall not be allowable in General Average; and, provided further, that any payment for pollution damage (as defined in Article I 6.(a) of the 1992 Protocol to the International Convention on Civil Liability for Oil Pollution Damage) shall also not be allowable in General Average. It is understood and agreed, however, that the cost of measures to prevent pollution or environmental damage, undertaken in respect of oil or pollutant substances which have not escaped or been released from the Vessel, shall be included in General Average to the extent permitted by the Rules. If a General Average statement is required, it shall be prepared at such port by an Adjuster from the port of New York appointed by the Carrier and approved by Charterer of Vessel. Such Adjuster shall attend to the settlement and the collection of the General Average, subject to customary charges. General Average Agreements and/or security shall be furnished by Carrier and/or Charterer, and/or Owner, and/or Consignee of cargo, if requested. Any cash deposit being made as security to pay General Average and/or salvage shall be remitted to the Average Adjuster and shall be held by the Adjuster at the Adjuster's risk in a special account in a duly authorized and licensed bank at the place where the General Average statement is prepared.

(iv) **BOTH TO BLAME.** If Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of Vessel, the owners of the cargo carried hereunder shall indemnify the Carrier against all loss or liability to the other or non-carrying ship or its owners insofar as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of said cargo, paid or payable by the other or recovered by the other or non-carrying ship or its owners as part of their claim against the carrying ship or Carrier. The foregoing provisions shall also apply where the owners, operators or those in charge of any ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact. The provisions in this subparagraph (iv) shall only apply if the Owner shall have exercised due diligence to make the Vessel seaworthy, and properly manned, equipped, and supplied, with the burden of proof in this regard resting solely on Owner.

(v) **LIMITATION OF LIABILITY.** Any provision of this Charter to the contrary notwithstanding, the Carrier shall have the benefit of all limitations of, and exemptions from, liability accorded to owner or chartered owner of vessels by any statute or rule of law for the time being in effect.

(vi) **DEVIATION.** Vessel shall have liberty to sail with or without pilots, to tow or be towed, to go to the assistance of vessels in distress, to deviate for the purpose of saving life or property or of landing any ill or injured person on board, and to call for fuel at any port or ports in or out of the regular course of the voyage.

(c) Except as provided in Paragraph (d) of this Clause, Owner and Vessel shall not be required to deliver cargo at a discharging port or place nominated by Charterer unless the party claiming right to such delivery shall first surrender to Vessel at such port or place one of the original Bills of Lading issued for the cargo, duly endorsed; provided however that, if the Bills of Lading name specific port(s) or place(s) of discharging and the nominated port or place is different or if the Bills of Lading provide for discharge at port(s) or place(s) as ordered, Owner and Vessel shall not be required to deliver the cargo unless the party claiming right to such delivery first surrenders to Vessel all the original Bills of Lading, duly endorsed. The foregoing shall apply even in the situation where one but not all of the original Bills of Lading have been placed on board Vessel at loading but, in such case, only the original Bill(s) of Lading not on board Vessel need first to be surrendered to Vessel in accordance with the foregoing requirements. Any delay to Vessel at the nominated port or place due to the unavailability at such port or place of original Bill(s) of Lading and/or the failure to timely surrender such Bill(s) of Lading to Vessel in accordance with the foregoing requirements shall count as laytime or, if Vessel is on demurrage, as time on demurrage.

(d) If original Bill(s) of Lading are not available at the discharging port or place for timely surrender to Vessel as provided in Paragraph (c) of this Clause, Vessel shall deliver the cargo to a party and at a facility at the discharging port or place as directed by Charterer in writing, if Charterer first executes a written indemnity in connection with such delivery in favor of Owner, Vessel, any Chartered Owner(s) of Vessel, Master, Vessel operators, agents and underwriters and delivers such indemnity to Owner or Owner's designee. The subject indemnity shall meet the requirements of Paragraph (e) of this Clause, and shall be limited in value to 200 per cent of the CIF value of the cargo.

(e) The indemnity referred to in Paragraph (d) of this Clause shall be a short form indemnity document incorporating the terms and conditions set forth in Clause 27(f) of this Charter. This document (which must be properly filled in) shall be given to Owner by telex, electronic mail, letter or facsimile as requested by Owner and be in the exact form quoted below, which document, when transmitted, shall be deemed to have been signed by person acting on behalf of Charterer.

"VOYAGE CHARTER OF _____

DATED _____

BETWEEN _____, AS OWNER
                          AND
                   _____, AS CHARTERER

Reference is made to the cargo ('Cargo') now laden aboard the above Vessel ('Vessel'). Pursuant to Clause 27(e) of the above captioned Charter ('Charter'), the undersigned requests that Owner(s) of the Vessel deliver the Cargo at _____ unto _____ without prior discharge site presentation to the Vessel of all original bills of lading issued for the Cargo appropriately endorsed for such delivery and/or at a discharge port or site other than one specifically named in said bills of lading.

In consideration of such delivery, the undersigned hereby gives an indemnity containing the terms and conditions set forth in Clause 27(f) of the Charter ('Indemnity Terms And Conditions'). The Indemnity Terms And Conditions are deemed incorporated in and made a part of this document. The term 'Indemnifier' in the Indemnity Terms And Conditions shall be deemed to refer to the undersigned. The term 'Cargo' and the phrase 'Requested Delivery' in the Indemnity Terms And Conditions shall be deemed to, respectively, mean the Cargo and the delivery request set forth in the preceding paragraph of this document. The term 'Ship' as used in the Indemnity Terms And Conditions shall be deemed to refer to the Vessel. Print the following information:

Name of Charterer                              _____

Name of Person Acting on Behalf of Charterer   _____

Authority/Title of Above Person                _____

Date Indemnity Given                           _____ "

(f) Indemnity Terms and Conditions. 530

"1. Indemnifier shall indemnify and hold harmless the Owner of the Ship, any chartered Owner of the Ship, the Ship 531
Master, the Ship underwriters and the Ship agents (hereinafter jointly and individually called 'Indemnitees') in respect of any liability, loss, 532
damage, costs (including, but not limited, to Attorney/Client costs) and other expense of whatever nature which the Indemnitees may 533
sustain or incur by reason of the Requested Delivery. 534

2. In the event of any legal action or proceedings being commenced against the Indemnitees in connection with the Requested Delivery, 535
Indemnifier shall provide Indemnitees from time to time, on the Indemnitees' demand, with sufficient funds to defend same. 536

3. If the Ship or any other vessel or other property belonging to the Indemnitees should be arrested or detained or if the arrest or 537
detention thereof should be threatened for any claim in connection with the Requested Delivery, the Indemnifier shall provide, upon 538
demand of the Indemnitees, such bail or other security as may be required to prevent such arrest(s) or detention(s) or to secure the 539
release of the Ship or such vessel or other property from arrest or detention, and shall indemnify and hold harmless the Indemnitees 540
against and from any loss, damage, costs (including but not limited to Attorney/Client costs) and other expense resulting from such arrest 541
or detention or threatened arrest or detention, whether or not same may be justified and to pay to the Indemnitees, on the Indemnitees' 542
demand, the amount of such loss, damages, costs and/or expense. 543

4. This Indemnity shall automatically become null and void, and Charterer's liability hereunder shall cease, upon presentation of all 544
original Bills of Lading duly endorsed to reflect delivery of Cargo in accordance with the Requested Delivery, or upon the expiration of 545
36 months after completion of discharge, whichever occurs first; provided that no legal proceedings arising from delivery of the Cargo 546
in accordance with the Requested Delivery have been instituted against the Indemnitees and/or Vessel within such 36-month period. 547
Owner shall advise Charterer with reasonable dispatch in writing if any proceedings are instituted. 548

5. The within Indemnity shall be governed and construed in accordance with the internal substantive laws of the State of New York, USA. 549
The Indemnitees may, but shall not be obligated to, bring any legal action or proceeding with respect to such Indemnity in the Courts of 550
the State of New York, USA or in the U.S. Federal Court situated therein and the Indemnifier unconditionally and generally accepts in 551
regard to such legal action or proceeding, for itself and its property, the jurisdiction and venue of the aforesaid courts." 552

28.  **WAR.** 553

(a) No contraband of war shall be shipped, but petroleum and/or its products shall not be deemed contraband of war for the purposes of 554
this Clause. Vessel shall not, however, be required, without the consent of Owner, which shall not be unreasonably withheld, to enter any 555
port, place, or zone which is involved in a state of war, warlike operations or hostilities, civil strife, terrorism and other politically or 556
religiously motivated activities, or piracy, whether there be a declaration of war or not, where it might reasonably be expected to be 557
subject to capture, seizure or arrest, or to a hostile act by a belligerent power (the term "power" meaning any de jure or de facto authority 558
or any other purported governmental organization maintaining naval, military or air forces or any terrorist group or organization). 559

(b) For the purposes of this Clause, it shall be unreasonable for Owner to withhold consent to any voyage, route, or port or place of loading 560
or discharging if insurance against all risks defined in Paragraph (a) of this Clause is then available commercially or under a government 561
program in respect of such voyage, route or port/place of loading or discharging. If such consent is given by Owner, Charterer shall pay 562
any provable additional cost of insuring Vessel against Hull war risks over and above such costs in effect on the date of this Charter in an 563
amount equal to the insured value stipulated in its ordinary marine policy as of the date of this Charter. If such insurance is not obtainable 564
commercially or through a government program, Vessel shall not be required to enter or remain at any such port, place or zone and, in 565
such case, Charterer shall have the right to order Vessel to load or discharge, as the case may be, at any other port(s) or place(s) 566
consistent with Part I (C) and (D). 567

(c) In the event of the existence of the conditions described in Paragraph (a) of this Clause subsequent to the date of this Charter, 568
Charterer shall, in respect of a voyage to any such port, place or zone, assume any provable additional cost of wages and insurance 569
properly incurred in connection with Master, officers and crew as a consequence of such war, warlike operations or hostilities over and 570
above such costs in effect on the date of this Charter. 571

29.  **EXCEPTIONS.** 572

(a) Vessel, Master and Owner shall not, unless otherwise expressly provided in this Charter, be responsible for any loss or damage to cargo 573
arising or resulting from: any act, neglect, default or barratry of Master, pilots, mariners or other servants of Owner in the navigation or 574
management of Vessel; fire, unless caused by the personal design or neglect of Owner; collision, stranding, or peril, danger or accident 575
of the sea or other navigable waters; or from explosion, bursting of boilers, breakage of shafts, or any latent defect in hull, equipment or 576
machinery. Neither Vessel, Master or Owner, nor Charterer, shall, unless otherwise expressly provided in this Charter, be responsible for 577
any loss or damage or delay or failure in performing hereunder arising or resulting from: act of God; act of war; perils of the sea; act of 578
public enemies, pirates or assailing thieves; arrest or restraint of princes, rulers or people, or seizure under legal process provided bond 579
is promptly furnished to release Vessel or cargo; strike or lockout or stoppage or restraint of labor from whatever cause, either partial or 580
general; or riot or civil commotion. 581

(b) The exceptions stated in Paragraph (a) of this Clause shall not affect Owner's warranties and undertakings herein with respect to the 582
condition of Vessel, the obligations of Owner in respect of the loading, handling, stowage, carriage, custody, care and discharge of the 583
cargo and/or the rights or obligations of either Owner or Charterer with respect to laytime or demurrage as elsewhere provided in this 584
Charter. 585

30.  **LIEN.** Owner shall have a lien on all cargoes and subfreights for all amounts due under this Charter, and Charterer shall have a lien on 586
Vessel for all monies paid in advance and not earned, and all disbursements for Owner's account, including commissions, cost of 587
insurance and expenses thereon and for any damages sustained by Charterer as a result of the breach of this Charter by Owner. 588

31.  **AGENTS.** Unless otherwise agreed, Charterer shall nominate Vessel's agents at all port(s) and place(s). Such agents shall be appointed, 589
instructed and paid for by Owner and represent solely the Owner and Vessel. 590

32.  **ASSIGNMENT / SUBLET.** Charterer shall have the option of assigning this Charter or of subletting Vessel, but in either case, Charterer 591
shall always remain responsible for the due fulfillment of this Charter in all terms and conditions. 592

33.  **CLEAN SEAS.** 593

(a) **HANDLING OF TANK WASHINGS.** Owner agrees to participate in Charterer's program covering oil pollution avoidance. Such 594
Program requires compliance with latest IMO and Port State regulations. The Program prohibits discharge overboard of all oil and all 595
oily water, oily ballast or cargo in any form unless in compliance with IMO and Port State local regulations or under extreme circumstances 596
whereby the safety of Vessel, cargo or life at sea would be imperiled. Owner shall ensure that Vessel's personnel comply with the following: 597

(i) Subsequent to the date of this Charter and in the course of the ballast passage before presenting for loading hereunder, 598
any oily residues remaining in Vessel from its previous cargoes shall be retained on board and shall be handled according to Charterer's 599
instructions. 600

(ii) During tank washing, the tank washings shall be collected into one cargo compartment and, after maximum separation of 601
free water, such free water shall be discharged overboard to the extent permitted by applicable international regulations. 602

(iii) Thereafter, Charterer shall be notified promptly of the estimated quantity of the segregated tank washings and the type and 603
source of such washings. If Charterer requires that demulsifiers shall be used for the separation of oil/water, such demulsifiers shall be 604
obtained by Owner and paid for by Charterer. Any additional Canal dues incurred on the ballast passage by reason of Vessel having tank 605

washings on board shall be for the sole account of Owner. Owner shall ensure that Master, on Vessel's arrival at the loading port(s) or place(s), does the following:

- arranges for the measurement of the segregated tank washings in conjunction with the cargo supplier(s);
- records the quantity of tank washings so measured in Vessel's ullage record;
- issues a Slop Certificate; and
- arranges that the Slop Certificate and/or Vessel's ullage record be duly signed by the cargo supplier(s) and promptly sent to Charterer.

The segregated tank washings and any other oily residues on board (hereinafter called "residues") shall, at Charterer's option, be pumped ashore into slop facilities at the loading port(s) or place(s), commingled with the cargo to be loaded or segregated from the cargo to be loaded.

If Charterer requires Master to discharge the residues at facilities at loading port(s) or place(s), no freight shall be payable on same but the time involved in accomplishing such discharge shall count as laytime or, if Vessel is on demurrage, as time on demurrage, including, but not limited to, waiting for availability of, or for berthing at, the slop receiving facility and shifting to and from such facility. Further, the cost of such facilities and the ultimate disposal of the residues shall be for Charterer's sole account. If Charterer requires residues to be kept separate from the cargo to be loaded, same shall, at Charterer's option, be discharged at the discharging port(s) or place(s) in accordance with Charterer's instructions.

If Charterer requires that the cargo be loaded on top of residues or that such residues be kept separate from the cargo to be loaded, in either case freight shall be payable in accordance with Clause 6 on the quantity of residues at the Overage Rate, if such rate exists, or otherwise at the Base Freight Rate, up to a maximum tonnage equivalent to one percent (1.0%) of Vessel's deadweight as specified in Part I (A), with the exception that, in the case of a Part Cargo Minimum, no freight shall be paid if the residues are kept separate and not discharged. In no event shall Charterer hold any liability for deadfreight in connection with residues, except where the Vessel is ordered to load a full cargo and is required to keep residues segregated, in which case deadfreight shall be due. Nothing in Charterer's instruction shall be construed as permission to contravene any applicable laws or regulations by the discharging of oily residues.

(b) **CLEAN BALLAST.** Owner warrants that Vessel will arrive at load port(s) with clean ballast.

(c) **ITOPF.** Owner warrants that it is a Member of the International Tanker Owners Pollution Federation ("ITOPF") and that Owner will retain such membership during the entire period of the services of the Vessel under this Charter.

34. **DRUG AND ALCOHOL POLICY.** Owner warrants that it has a policy on Drug and Alcohol Abuse ("Policy") applicable to the Vessel which meets or exceeds the standards in the Oil Companies International Marine Forum Guidelines For the Control of Drugs and Alcohol Onboard Ship. Under the Policy, alcohol impairment shall be defined as a blood alcohol content of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall be all Vessel officers and the drug/alcohol testing and screening shall include unannounced testing in addition to routine medical examinations. An objective of the Policy should be that the frequency of the unannounced testing be adequate to act as an effective abuse deterrent, and that all officers be tested at least once a year through a combined program of unannounced testing and routine medical examinations. Owner further warrants that the Policy will remain in effect during the term of this Charter and that Owner shall exercise due diligence to ensure that the Policy is complied with. It is understood that an actual impairment or any test finding of impairment shall not in and of itself mean the Owner has failed to exercise due diligence.

35. **ARBITRATION.**

(a) Any and all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration in the City of New York, pursuant to the laws relating to arbitration there in force, before a board of three persons, consisting of one arbitrator to be appointed by Owner, one by Charterer and one by the two so chosen. The decision of any two of the three on any point or points shall be final. Until such time as the arbitrators finally close the hearings either party shall have the right by written notice served on the arbitrators and on the other party to specify further disputes or differences under this Charter for hearing and determination. The arbitrators may grant any relief which they, or a majority of them, deem just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance. Awards made in pursuance to this Clause may include costs, including a reasonable allowance for attorney's fees, and judgment may be entered upon any award made hereunder in any Court having jurisdiction in the premises.

(b) Where cargo carried pursuant to this Charter is owned by an Affiliate, any claim related to the carriage of such cargo hereunder shall be subject to this Clause 35, said Affiliate having authorized Charterer to so agree on Affiliate's behalf. If this subparagraph (b) applies, the term "Charterer" in subparagraph (a) of this Clause 35 shall be taken to mean the aforementioned Affiliate.

36. **WAIVER OF CLAIMS.** Any claim for freight, deadfreight, demurrage and/or charges or expenses under this Charter shall be deemed waived, extinguished and absolutely barred if such claim is not received by Charterer or Owner, as the case may be, in writing with supporting documentation within 90 days from the date of final discharge of the cargo on the voyage with respect to which said claim arises. This Clause shall not apply with respect to claims for damage, loss or shortage of cargo.

37. **BUSINESS POLICY.** Owner agrees to comply with all laws and lawful regulations applicable to any activities carried out in the name, or otherwise on behalf, of Charterer under the provisions of this Charter. Owner agrees that all financial settlements, billings and reports rendered by Owner to Charterer, as provided for in this Charter, shall, in reasonable detail, accurately and fairly reflect the facts about all activities and transactions handled for the account of Charterer.

38. **INTERPRETATION.** The interpretation of this Charter and the rights and obligations of the parties thereto shall be governed by the Federal Maritime Law of the United States and where applicable by the Law of the State of New York, without taking into consideration any conflict of laws principles. The heading of Clauses and Paragraphs are for convenience of reference only and shall not affect the interpretation of this Charter. No modification, waiver or discharge of any term of this Charter shall be valid unless in writing and signed by the party to be charged therewith. Notwithstanding anything in this Charter to the contrary, this Charter shall not be interpreted or applied so as to require Owner or Charterer to do, or to refrain from doing, anything which would constitute a violation of, or result in a loss of economic benefit under, United States anti-boycott laws and regulations.

39. **CHARTER ADMINISTRATION.** All Charter terms and conditions finally agreed to by the parties shall be evidenced by a fixture confirmation notice approved by Owner and Charterer. Charterer shall cause the fixture confirmation notice to be transmitted to both Owner and Charterer and each party shall give approval of the fixture confirmation notice one to the other no later than three (3) business days after transmission of the notice. Failure of either party to respond within the said three (3) days shall be conclusively deemed to constitute that party's unqualified acceptance of the fixture confirmation notice. Except as requested in writing by either Owner or Charterer, there shall be no formal written and signed Charter Party.

# INDEX OF CLAUSES

## PART I

(A) VESSEL DESCRIPTION AND POSITION
(B) LAYDAYS
(C) LOADING RANGE(S) / PORT(S) / PLACES(S)
(D) DISCHARGING RANGE(S) / PORT(S) / PLACE(S)
(E) CARGO QUANTITY
(F) CARGO DESCRIPTION
(G) FREIGHT RATE
(H) BILLING
(I) LAYTIME
(J) DEMURRAGE / DEVIATION PER DAY
(K) SPECIAL PROVISIONS
(L) INCORPORATED CLAUSE(S)

## PART II

1.  DEFINITIONS
2.  VESSEL
3.  CLEANING
4.  VOYAGE(S)
5.  MAXIMUM CARGO
6.  FREIGHT
7.  DEADFREIGHT
8.  DEMURRAGE / DEVIATION RATE
9.  LOADING AND DISCHARGING PORT(S) / PLACE(S)
10. ESTIMATED TIME OF ARRIVAL (ETA)
11. NOTICE OF READINESS
12. CANCELLATION OF CHARTER
13. LAYTIME / DEMURRAGE
14. LAYTIME / DEMURRAGE CONSEQUENCES
15. LIGHTERING / CARGO ADVISOR
16. LOADING / DISCHARGING PLACE
17. CARGO MEASUREMENT
18. PUMPING IN AND OUT
19. BACK LOADING
20. DUES, TAXES AND OTHER CHARGES

21. ICE
22. DRY CARGO
23. QUARANTINE
24. INSPECTION
25. HEAT
26. BUNKERS
27. BILLS OF LADING
28. WAR
29. EXCEPTIONS
30. LIEN
31. AGENTS
32. ASSIGNMENT / SUBLET
33. CLEAN SEAS
34. DRUG AND ALCOHOL POLICY
35. ARBITRATION
36. WAIVER OF CLAIMS
37. BUSINESS POLICY
38. INTERPRETATION
39. CHARTER ADMINISTRATION

**ExxonMobil VOY2005 September 1, 2005**

**VALERO MARKETING AND SUPPLY COMPANY**
**CHARTER PARTY CLAUSES**
**June 26, 2006**

**SPECIAL CLAUSES**
1. CHARTER PARTY FORMAT
2. CONTRACT INTERPRETATION
3. CHANGES TO PART II OF THE EXXONMOBIL VOY2005 (SEPTEMBER 1, 2005) FORM
4. ADHERENCE TO VOYAGE INSTRUCTIONS
5. AG
6. ASSIGNMENT
7. CARGO OPERATIONS
8. EFFICIENT DEMURRAGE CLAIM PROCESSING (JULY 1, 2002)
9. EXCESS BERTH OCCUPANCY
10. INDEMNITY
11. INSURANCE
12. ITF
13. MARPOL AND CLC
14. OFAC SDN
15. PAULSBORO/DEL CITY
16. QUESTIONNAIRE AND VESSEL DESCRIPTION
17. SECURITY REGULATIONS (JUNE 10, 2004)
18. U.S. CUSTOMS AND BORDER PROTECTION REGULATIONS
19. U.S. GULF LIGHTERING WARRANTIES (Vers. 2005-1)
20. VESSEL EXPERIENCE FACTOR (ARZEW / MEXICO)
21. VGO CLEANING

**OUTCHARTERS / CO-LOADS**
22. CARGO LOSS ALLOCATION (CO-LOADS) *
23. INTERPRETATION (OUTCHARTERS) *
24. LAYTIME ACCOUNTING (CO-LOADS) *
25. LIGHTERING (OUTCHARTERS) *

**ExxonMobil VOY2005 September 1, 2005**

**1. CHARTER PARTY FORMAT**

    A.       EXXONMOBIL VOY2005 September 1, 2005

    B.       Overage at fifty percent (50%)

**ExxonMobil VOY2005 September 1, 2005**

## 2. CONTRACT INTERPRETATION

In addition to and in furtherance of the operation of clause 38 of the ExxonMobil VOY 2005 (September 1, 2005) Charter Party Form, Part II of this provision shall also apply.  In the event of any conflict between Owner and Charterer concerning the terms and conditions of their agreement, it is agreed that the following priority of documents will apply and govern in the following order: 1) fixture recap, 2) Valero Marketing and Supply Company Charter Party Clauses, 3) ExxonMobil VOY 2005 (September 1, 2005) Tanker Voyage Charter Party printed form.

**ExxonMobil VOY2005 September 1, 2005**

**3. CHANGES TO PART II OF THE EXXONMOBIL VOY2005 (SEPTEMBER 1, 2005) FORM:**

A.      <u>Clause 1(f). Line 14</u>. Change "Affiliate" to mean "With respect to Owner, the term "Affiliate" means any individual, corporation, partnership (whether general or limited), limited liability company, trust, or other entity or association which is, either directly or indirectly, through one or more intermediaries, controlling, controlled by, or under the common control of the ultimate parent entity of Owner and, with respect to Charterer, the term "Affiliate" means any individual, corporation, partnership (whether general or limited), limited liability company, trust, or other entity or association which is, either directly or indirectly, through one or more intermediaries, controlling, controlled by, or under the common control of Valero Energy Corporation."

B.      <u>Clause 4(a). Line 54</u>.      Change the word "lightering" to read "cost of lighters".

C.      <u>Clause 10(e). Line 144</u>. After the word "fast", add the phrase, "with gangway down;".

D.      <u>Clause 11. Line 151</u>.      After the word "berth." add the following new sentence, "If the vessel is ordered to anchor, an NOR tendered before arrival at the customary anchorage will only be considered valid from the time of anchoring."

E.      <u>Clause 12. Line 153</u>.      After the word "tendered", add the phrase "or will be unable to give".

F.      <u>Clause 13(c). Lines 173 and 174</u>.      In two places, change the words "two (2)" to "three (3)".

G.      <u>Clause 14(b) Line 185</u>.  After the word "labor," insert the phrase "Acts of God, torts of third parties,".

H.      <u>Clause 14(c) (ii). Lines 201 and 202</u>.  (1) In two places before the word "anchorage", insert the phrase "ship-to-ship offshore lightering area," (2) Line 202. After the word "lightering", add the phrase,  "or delivery from lighters".

I.      <u>Clause 14(e). Line 239</u>.        Before the word "laytime", insert the word "half".

J.      <u>Clause 15 (c)(i). Line 252</u>.      At end add of the clause, the following: "provided that laytime or time on demurrage while waiting for berth thereafter shall resume only upon expiration of 6 hours after arrival at customary anchorage or waiting place, or when all fast in berth, whichever occurs first."

K.      <u>Clause 18(f). Line 342</u>.  After the word "time", insert the phrase "plus 3 hours for stripping" and before the word "maintain" strike the word "or" and insert the word "and".

L.      <u>Clause 27(b)(v). Line 478</u>.      Add the end of the clause, add the following phrase: "and Charterer shall have the same limit on liability for claims by Owner against Charterer as the limit on liability which Owner has for claims by Charterer against Owner arising from the same event(s)."

M.      <u>Clause 35(a). Line 643</u>. Change the phrase "City of New York" to "Houston, Texas" .

**ExxonMobil VOY2005 September 1, 2005**

## 4. ADHERENCE TO VOYAGE INSTRUCTIONS

Charter's voyage instructions are deemed to form an integral part of the Charter Party.  If a conflict arises between terminal orders and Charterer's voyage instructions, Master is to stop cargo operations and to contact Charterer at once.   Terminal orders shall never supersede Charterer's voyage instructions.   Vessel shall not resume cargo operations which have been suspended under this clause until Charterer has directed vessel to do so.  Time lost during such interruption of cargo operations shall be for Charterer's account.

**ExxonMobil VOY2005 September 1, 2005**

**5. AG**

A.      As used in this Clause, the phrase "war events" means war, war-like operations or hostilities, civil strife, revolution and/or piracy, whether there be a declaration of war or not.

B.      If, after the Vessel has tendered notice of readiness at the load port (or, if a multi-port load, then at the first load port) nominated by Charterer hereunder, or after passing Latitude 24 Degrees North inwards, the Vessel is unable to load due to the unavailability of the cargo, the inability of the Vessel to berth, the inability of the loading facility to deliver the cargo and/or any other event of the like or different kind, directly or indirectly caused by the happening of war events (before or after the tender of notice of readiness), Charterer shall not be obligated to nominate another port and shall have the option to cancel this Charter upon telex, email or other immediate written notice to Owner, the effective date of Charter cancellation to be the date of the notification ("effective date"). If Charterer exercises this option, the sole liability of Charterer to Owner with respect to the cancellation or otherwise under the Charter shall be to pay Owner an amount equal to the demurrage for all time used from passing Latitude 24 Degrees North Inwards until theoretical time of passing 24 Degrees Parallel Southbound at full speed plus the cost of steaming bunkers consumed, the provable and documented port charges incurred by Vessel under this Clause and any provable and documented additional cost of hull insurance, crew wages and insurance incurred by Owner as described in Clause 28.

C.      Upon sailing from the load port Vessel to proceed at full speed until arrival Latitude 25 Degrees North and proceed at Charter Party speed.

D.      Owner shall have the right to delay entry into or exit from the Arabian Gulf in case of war event in the Arabian Gulf South of latitude 20 degrees 30 minutes North in the Arabian Gulf.  Any delay by reason of the foregoing shall not count as laytime, or if the Vessel is on demurrage, as demurrage.

Additional bunkers consumed in speeding up Vessel as required under this Clause to be for Charterer's account and will be paid for at the price of bunkers at last load port at day of loading.

**ExxonMobil VOY2005 September 1, 2005**

## 6. ASSIGNMENT

Notwithstanding any other provisions of this Charter Party, Charterer may freely assign all of its rights and delegate obligations under this Charter Party to any one of its Affiliates.

**ExxonMobil VOY2005 September 1, 2005**

## 7. CARGO OPERATIONS

Charterer shall have the option to commingle, blend, add dyes, or additives, and / or carry out such other cargo operations ("cargo operations") as charterers may reasonably request; provided that such cargo operations are within the technical capability of the Vessel and that the Master in the exercise of his reasonable judgment considers it safe to do so.

Charterer, without prejudice to any other Owner's duties and obligations under the Charter Party and/or Bills of Lading, agrees to indemnify the Owner, Vessel and Master against liability for any cargo quality claims brought by any third party that may arise solely as a direct result of any such onboard blending, requested by Charterer.

Any additional charges that result directly from Charterer exercising such cargo operations, including demurrage, port charges, extra agency fees, consumed bunkers at documented replacement cost, etc., and which are not included in the freight agreed under Part I (G) of this Charter Party, shall be for the account of Charterer.

In case of blending operation, Charterer will surrender to Master all original Bills of Lading for the unblended cargo and the Master will provide new consolidated Bills of Lading on completion of blending operations, which Bills of Lading will reflect the actual grade that has been blended.

**ExxonMobil VOY2005 September 1, 2005**

## 8. EFFICIENT DEMURRAGE CLAIM PROCESSING (JULY 1, 2002)

It is the Charterer's intention to pay demurrage due on a timely basis and for this purpose; we have set forth below a listing of the supporting documentation to be included with the demurrage claim.

For purposes of demurrage under this C/P and with reference to Part II, clause 36, supporting documentation, duly signed with authorized signatures, for demurrage claims shall include, but not be limited to, the following:

A.     Completed STB Port Log for each port
B.     Notice of Readiness message at all port(s)/berth(s)
C.     Bills of Lading for co-loads and parcel tankers
D.     Notes of protest given and/or received by the vessel
E.     Pumping logs
F.     Crude Oil Washing logs (if applicable)
G.     Statement of facts/Port logs/Terminal time sheets
H.     Agents' time sheets

Failure to receive all of the above documentation in the standard format prior to the time bar date will result in the claim being barred.

**ExxonMobil VOY2005 September 1, 2005**

## 9. EXCESS BERTH OCCUPANCY

If, after disconnection of hoses, the Vessel remains at berth solely for ship's purposes, Owners will be responsible for all direct and indirect costs charged to Charterer by the terminal/suppliers/receivers.

**ExxonMobil VOY2005 September 1, 2005**

**10. INDEMNITY**

A.      Except as otherwise provided paragraph B, below, Owner shall be responsible for and shall protect, defend (upon Charterer's request), indemnify, and hold Charterer and its Afftiliates, as well as all of the officers, directors, employees, and agents of each such entity (collectively, the "Charterer Indemnitees"), harmless from and against any and all claims, costs, damages and expenses, including reasonable attorney's fees, of whatsoever nature or kind (collectively, "Claims"), in favor of any person (including, without limitation, any of the Charterer Indemnitees), arising out of or in any way directly or indirectly connected with (1) any injury to, or death of, any person, (2) any damage to, or loss or destruction of, any property (including, but not limited to, the Vessel), (3) any contamination of, or adverse impact on, the environment, (4) any violation or alleged violation of any law, rule, regulation, statute, ordinance, order, judgment, decree, or other legal or judicial mandate by Owner, the Vessel, or any of the Vessel's crew, or (5) Owner's performance of this Charter Party which, in any such case, which results from, is caused by, or is otherwise associated with the ownership, operation, maintenance, navigation, management, use, occupation, and/or control of the Vessel by Owner, an Affiliate of Owner, or any of their respective employees, agents, contractors, subcontractors, or other representatives, and whether arising in tort, contract, warranty, indemnity, or by operation of law, and whether or not caused in whole or in part by the negligence, strict liability or other fault of Charterer.

B.      Nothing contained herein shall be construed or held to deprive the Charterer or Owner, as against any third party, of any right to claim limitation of liability with respect to the Vessel as provided by any applicable law, statute or regulation.  However, Owner agrees contractually to waive any such limitation of liability rights as to Charterer's claims.

C.      In the event of a pollution incident involving the discharge of any petroleum product from the Vessel, Owner agrees to activate its spill response plan and organization to respond to the discharge, and take all necessary action to clean up and/or mitigate pollution damage                as               required              by             applicable            law.

**ExxonMobil VOY2005 September 1, 2005**

## 11. INSURANCE

At all times during the term of this Charter Party, Owner shall maintain in full force and effect, with respect to its operations and that of the chartered Vessel, the following types and amounts of insurance coverage:

A.      *Marine Hull and Machinery Insurance.*      Hull Insurance, including collision liability to the full value of the Vessel, naming Charterer and the Mortgagee as an additional assured, as their respective interests may appear, and waiving all rights of subrogation against Charterer, and deleting from the Inchmaree clause the exception "other than an assured" from the coverage of negligence of Charterer.

B.      *Protection and Indemnity Insurance (including Pollution).*     Protection and Indemnity Insurance (S.P. 23 or equivalent) in an amount of at least U.S.$1,000,000,000, with the phrase "as Owner of the Vessel named herein" and all similar phrases purporting to limit the underwriter's liability to that of an owner, being deleted, and naming each of the Charterer and the Mortgagee as an additional assured, as their respective interests may appear, and waiving all rights of subrogation against Charterer.  Owner represents and warrants that said coverage shall include, without limitation, coverage for crew liability, third party bodily injury and property damage liability, and collision liability. Furthermore, Owner will enter the Vessel with the Water Quality Insurance Syndicated ("WQIS") or acceptable equivalent, which will provide a Guarantee for the Certificate of Financial Responsibility as required under OPA90 for vessels trading into the coastal waters of the United States of America.  Owner shall also carry OPA and CERCLA coverage, said insurance to name Charterer as an additional assured with waiver of subrogation.  Owner also will obtain insurance to cover liability exposure under the International Convention on Civil Liability for Oil Pollution Damage ("CLC") in the waters where the Vessel will operate, such insurance naming Charterer as an additional insured with waiver of subrogation.

C.      *Workmen's Compensation Insurance.*      If and when Owner has personnel operating from an onshore location, workmen's compensation insurance, including, but without limitation, the Longshoremen's and Harbor Workers' Compensation Act, USL&N, Jones Act, Death on the High Seas, and employer's liability insurance in an amount as specified by applicable law or as otherwise mutually agreed between Owner and Charterer, and said insurance shall expressly waive all rights of subrogation against Charterer.

D.      *Comprehensive General Liability Insurance.*      Comprehensive general liability insurance, including, but without limitation, public liability and property damage coverage, premises coverage, and contractual liability coverage, in an amount of at least U.S. $10,000,000, any "watercraft exclusion" being deleted, and naming each of the Charterer and the Mortgagee as an additional assured waiving all rights of subrogation against Charterer.

E.      *War Risks.*      Owner will enter the Vessel with a War Risk Association to provide coverage not less than the sum insured under (a) above.

F.      *Terrorism.*      Insurance in an amount to cover liability exposure for terrorist events pursuant to the U.S. Terrorism Risk Insurance Act ("TRIA").   Such insurance to name Charterer and Mortgagee as additional insureds with waiver of subrogation.

G.      *Minimum Amounts of Coverage.*      Owner's liability under this Charter Party is in no way limited to or by the types of insurance set forth above, or by the minimum, monetary amounts of those insurance coverages.  Owner shall be solely responsible for all deductible assumptions or retentions under any insurance policies required hereunder, and for all losses, damages, or liabilities resulting from Owner's failure to provide or maintain the insurance required

herein.  Owner shall be and remain liable to the full extent as determined otherwise in this Charter Party.

H.    *Primary Coverage*.       All insurance required hereunder shall be endorsed to be primary over any insurance coverage that Charterer or any of its Affiliates might carry on its own behalf (which other insurance, if any, shall be excess, secondary, or non-contributing to that provided by Owner hereunder) and shall include Charterer and each of its Affiliates, including all of their respective officers, directors, and employees, as additional assureds, with full waivers of subrogation and without liability by being an additional assured for the payment of premium assessments or other charges.

I.    *Administrative Matters*.           Owner confirms that all insurance policies are written on a twelve (12) month basis and undertakes to:

1.    As of the date of this Charter Party and from time-to time as requested by Charterer, provide Charterer with certificate(s) of insurance and copies of additional assured endorsements from a good and solvent insurance company or companies evidencing the herein-required minimum insurance coverages are in effect pursuant to this Clause.

2.    Advise Charterer of the renewal of the said policy of insurance, including any changes in terms or conditions within 30 days of the renewal.

3.    Advise Charterer within fifteen (15) days prior written notice of any notice or cancellation or change in coverage which may be issued by the insurer to the Owner.

J.    *Failure to Procure Required Insurance*.    In the event that Owner should fail to secure the insurance coverages set forth in the preceding paragraphs, with or without knowledge of Charterer, then Owner shall itself be an insurer to the extent that it has failed to comply with the obligations to provide insurance hereunder, and further agrees to defend, protect, indemnify, and hold Charterer and its Affiliates harmless to the same extent as if said insurance coverages had been obtained.   It is Owner's responsibility to ensure that the coverages obtained comply with the requirements of this Claus, and while the certificate(s) of insurance and additional assured endorsements is proof of such compliance sufficient for Owner to commence services under this Charter Party, Charterer's acceptance of any such certificate and/or endorsements that purports to comply with the requirements of this Charter Party does not indicate an acceptance of the insurance as procured and does not waive Charterer's right to enforce this Charter Party if it is later determined that the required insurance was not properly procured.

K.    *Charterer's Insurance*.    It is understood and agreed that the insurance coverages provided by Owner shall operate independent and apart from any obligations imposed on Owner under   the   indemnity   provisions   in   this   Charter   Party   or   elsewhere.

**ExxonMobil VOY2005 September 1, 2005**

**12. ITF**

Owner warrants that the Vessel (a) fully complies with all applicable ITF requirements, and (b) has a valid ITF certificate or equivalent onboard at all times during this Charter Party.

**ExxonMobil VOY2005 September 1, 2005**

## 13. MARPOL AND CLC

      Owner warrants that the Vessel shall be eligible under all applicable international or bilateral treaties and conventions, including International Ship Management ("ISM") Code, United States Federal laws and regulations, including but not limited to OPA and the Maritime Transportation Security Act, Department of Homeland Security and  USCG regulations, the International Convention for the Prevention of Pollution from Ships (MARPOL 1973), including Annex VI, and the 1978 protocol thereto as applicable; and the International Convention for Safety of Lives at Sea (SOLAS 1974) and the 1978 protocol thereto as applicable for trading to all ports and places as previously described.  The Vessel shall have on board for inspection all records, compliance letters, certificates and other documents required for such service, including the ISM Code Certificate, USCG COFR and the certificate required by Article VII of the International Convention on Civil Liability for Oil Pollution Damage, as amended, when applicable. If any delays, expenses, costs and/or damages shall be incurred by reason of non-compliance with the provisions of this clause, including but not limited to delays caused by necessary revalidation of the Vessel's expired certificates, all applicable expenses, costs and damages, including demurrage, shall be for Owner's account.

ExxonMobil VOY2005 September 1, 2005

## 14. OFAC SDN

Owner represents and warrants that the Vessel is not a vessel identified on the U.S. Department of Treasury, Office of Foreign Assets Control's Specially Designated Nationals and Blocked Persons List.

**ExxonMobil VOY2005 September 1, 2005**

## 15. PAULSBORO/DELAWARE CITY

If Charterer discharges at both Paulsboro, New Jersey and Delaware City, Delaware, such shall be considered one port.  Charterer will pay shifting expenses in accordance to Part II Clause 6(c). The applicable Worldscale rate shall be calculated as loadport(s) to Paulsboro (Philadelphia rate applies).

**ExxonMobil VOY2005 September 1, 2005**

## 16. QUESTIONNAIRE AND VESSEL DESCRIPTION

Charterer has entered into this Charter Party in reliance on the representations contained in the Owner's(s') answers to the completed most recently published Valero Ship Questionnaire which shall be deemed material and incorporated into and form part of the Charter Party.  Owner shall notify Charterer immediately of any matter, event or circumstance howsoever caused, intentional, unintentional, accidental or otherwise, which necessitates any change, amendment or modification to the Owner's(s') answers.   In the event any such change, amendment or modification is necessary, whether notified to the Charterer or not, or if the Vessel is mis-described or there is any other misstatement in the Valero Ship Questionnaire, the Charterer shall have the option but not the obligation, and without prejudice to any other claim, to cancel this Charter Party without any further liability whatsoever save for the payment of demurrage, if any, due at the date of cancellation.

**ExxonMobil VOY2005 September 1, 2005**

**17. SECURITY REGULATIONS**

A.      This clause applies to all ports where either of the following security regulations ("Security Regulations") is in effect:

        1. International Ship and Port Facility Security (ISPS) Code, most recent version; and

        2. U.S. Maritime Transportation Security Act of 2002, most recent version.

B.      Any delays to the Vessel at ports of loading or discharge due to the failure of the Vessel to comply with the Security Regulations shall be for Owner's account except where such delays are solely and directly attributable to Charterer's failure to timely provide information required by the Security Regulations, in which case, the delays shall count as laytime or, if the Vessel is on demurrage, as time on demurrage.

C.      If demurrage is incurred under this Charter Party and the Vessel has been delayed in berthing, loading and/or discharging for any reason attributable to Security Regulations other than stipulated in Section B, above, such delay shall be deemed a Listed Condition under paragraph 14(b) of the Charter Party and that span of time on demurrage equal to the period(s) of delay described in this section C shall be paid at half rate.

D.      Expenses solely attributable to Security Regulations which are not otherwise specifically allocated in this Charter Party and/or WORLDSCALE shall be apportioned between Owner and Charterer consistent with the apportionment of delays set forth in sections B. and C., above.

**ExxonMobil VOY2005 September 1, 2005**

## 18. U.S. CUSTOMS AND BORDER PROTECTION REGULATIONS

A.      Throughout this Charter Party, Owner and the Vessel shall comply with all applicable U.S. Customs and Border Protection (CBP) regulations, including 19 C.F.R. §4.7 and any subsequent amendments thereto that require the filing of cargo manifest information electronically 24 hours prior to arrival, and shall undertake the role of carrier for purposes of such regulations.

B.      Throughout this Charter Party, Owner warrants that it:

1.      Has in place a Standard Carrier Alpha Code (SCAC);
2.      Has in place an International Carrier Bond (ICB);
3.      Will provide Charterer with timely confirmation of (1) and (2), above, upon request; and
4.      Will submit a cargo declaration, cargo manifest and other required cargo documentation (including any required Permits to Transfer (PTTs)) to CBP via CBP's Vessel Automated Manifest System (AMS) and, promptly provide Charterer with copies thereof.

ExxonMobil VOY2005 September 1, 2005

## 19. U.S. GULF LIGHTERING WARRANTIES (Vers. 2005-1)

Throughout this Charter Party, Owner warrants following (State yes or no):

A.      Master and Chief Officer have lightering experience or, if not Owners' Port Captain to be on board during lightering operations. _____

B.      Vessel will have the following:

1.      Minimum of five closed chocks and three bollards available at the starboard side forward mooring station to accommodate a total of eight head lines. _____
2.      Two closed fairleads located approximately 35 meters max forward and aft of the center of manifold with associated mooring bollards and leads to winches as per OCIMF "Ship to Ship Transfer Guide" and "Mooring equipment Guidelines." _____
3.      Minimum of three closed chocks and two bollards available at the starboard side aft (poopdeck) mooring station. _____

C.      Vessel's mooring wires are fitted with OCIMF synthetic tails, with Mandel or Tonsberg connecting link shackles._____

D.      Vessel is able to maintain speed below 5.0 knots during lightering. _____

E.      Vessel can maintain manifold to waterline distance less than 24 meters throughout lightering, with trim not exceeding 6 meters. _____

F.      Vessel has closed chocks. _____

G.      Vessel not to bunker in U.S. Gulf while Valero Energy Corporation's or one of its Affiliate's cargo is aboard. _____

H.      Vessel to have four (4) messenger lines of 200 meters x 40 mm braided or plaited polyester or polypro-polyester construction._____

I.      Vessel has a Tank Vessel Examination (TVEL) that will be current on arrival at U.S. Gulf. _____ (not always possible)

J.      Vessel has a helicopter landing area that meets the ICS Guide to Helicopter/Ship Operations Requirements as seen in sections 4.2.1 or 4.2.2. _____

K.      Vessel will have four (4) watch officers at lightering site, not including the Master. _____

L.      Vessel will have a class approved personnel basket on board for use during lightering operation. _____

**ExxonMobil VOY2005 September 1, 2005**

**20. VESSEL EXPERIENCE FACTOR (ARZEW / MEXICO)**

A.      For Vessels loading dirty petroleum products at Arzew, Algeria:

Owner will supply load port Vessel Experience Factor (VEF) data for this Vessel consistent with the latest edition of API MPMS Chapter 17. 1. The information should include port shore Total Calculated Volume (TCV), Vessel Total Calculated Volume after Load (TCV) and Vessel Total Calculated Volume before Loading (On Board Quantity - OBQ) for 10 or more qualifying voyages. For voyages whose volumes have been corrected to 60 degrees F with old Volume Correction Factor tables, the Owner shall provide shore and/or Vessel temperature data (These data requirements can be satisfied by having available in the ship's files, copies of the hand written report of the independent inspector which is normally left on board at the completion of loading plus the copy of the Bill of Lading for the voyage.  If data are not available for 10 voyages, this requirement may be met by supplying data on voyages subsequent to this Charter Party. On request, the Owner shall provide copies of ullage forms used to calculate Vessel volumes.

B.      The following data is required for loadings from Mexican ports:

1. Load date.
2. Load port.
3. Crude or feedstock type cargo.
4. Bill of Lading gross barrels.
5. Bill of Lading basis (i.e., shore figures or Vessel's figures).
6. Vessel's total cargo volume (TCV) after loading (at 60 degrees Fahrenheit including free water).
7. Vessel's OBQ (oil and water) before loading.
8. Vessel's cargo received (TCV - OBQ).
9. VEF (shore/ship) for each voyage.
10. Vessel's maximum cargo carrying capacity.
11. Last time ship was in dry-dock.

This information should be available for the previous twenty (20) successive loadings, except for loadings when the Vessel's figures were used for the Bill of Lading. The data is required because the Bill of Lading figures for Mexican loadings are based on Vessel's figures adjusted for VEF.

If the data is lacking or unacceptable to Pemex, the Mexican State Petroleum Company, they will use a VEF of 1.00 which could be to the Receiver's disadvantage.  When a Vessel is nominated to load at a Mexican port, the VEF data should be supplied to Valero Energy Corporation or one of its Affiliates, and to the attending cargo inspectors at the loading port.

**ExxonMobil VOY2005 September 1, 2005**

## 21. VGO CLEANING

Owner warrants that Vessel, upon arrival loadport, will have fresh water cleaned all cargo carrying compartments, pipes, pumps, and lines, and that the Vessel will be in all respects suitable for the carriage of vacuum gas oil utilizing the following operations:

A.      During the voyage to or at loadport, all cargo tanks, pumps and lines to be rinsed with fresh water, drained and stripped dry so that neither sodium nor sulfur contamination should exist. This will include the removal from the cargo tanks of all excess water, bottom sediments and residues of previous cargoes.

B.      All sea suctions and other outboard valves connected to the cargo system must be sealed before and during loading. Any delays as a result of Vessel not meeting Charterer's inspection satisfaction for cleaning at loadport, shall be for Owner's account and time not to count as laytime, or if vessel is on demurrage, as time on demurrage.

**ExxonMobil VOY2005 September 1, 2005**

**22. CARGO LOSS ALLOCATION (CO-LOADS)***

The following procedures shall be used to provide compensation for the differences in the cargo volume received when there are multiple cargo owners:

      A.      Allocation Factor = (Sum Total NSV BOLs) divided by (Sum Total NSV Outturn);

      B.      NSV Allocated Parcel Load = (NSV Parcel Outturn) times (Allocation Factor); and

      C.      NSV Volume Adjustment = (NSV Allocated Parcel Load) minus (NSV Parcel BOL)

      An appropriate debit/credit is to be issued to each cargo owner upon completion of the allocation such that all cargo owners shall have the same NSV shore to shore loss percent.  The basis for payment shall be the "NSV Volume Adjustment" multiplied by the weighted average price of all crudes in the shipment. Platt's or other agreeable industry source may be used to establish the cargo price.  All measurements shall be in accordance with the latest API standards. All volumes shall be calculated using the 1980 Petroleum Measurement Tables. All loadings and discharges shall be attended by independent cargo inspector(s) mutually acceptable to all parties. Each party shall instruct their inspectors to provide promptly to all cargo owners, the outturn volumes (NSV) at each respective discharge ports.  The above is without prejudice to any party's right to file a cargo shortage or loss claim. Any claim settlements shall be prorated amongst all cargo owners.

ExxonMobil VOY2005 September 1, 2005

**23. INTERPRETATION (OUTCHARTERS)\***

      Notwithstanding any other provision in this Charter Party or any other document, neither this Charter Party nor any other document shall constitute an agreement by Owner or Charterer to take any action or refrain from taking any action that is in violation of, in conflict with, penalized under or compliance with which is prohibited by applicable U.S. law.

ExxonMobil VOY2005 September 1, 2005

## 24. LAYTIME ACCOUNTING (CO-LOADS)*

If same port(s) are used in load or discharge by partners, laytime used at such port(s) to be shared in proportion to the quantities loaded/discharged by each partner at such port. If different port(s) used, time to count separately. It is understood and agreed that specific delays caused by or attributed to either partner only shall be borne by that partner.

**ExxonMobil VOY2005 September 1, 2005**

## 25. LIGHTERING (OUTCHARTERS)*

      All lightering operations are to be conducted as per the latest OCIMF standards for ship to ship transfers. Lightering location(s) and lightering vessel(s) shall be approved by Owner or disponent Owner, but same is not to be unreasonably withheld, delayed, or conditioned.



# SPECIAL CIRCULAR

No. 7 – 7 December 2015

161 Bagsvaerdvej
DK - 2880 Bagsvaerd
Tel: +45 4436 6800
documentary@bimco.org
www.bimco.org

**Anti-Corruption Clause for Charter Parties**

### Background

The shipping industry fully supports international efforts to eradicate bribery and corruption. Bribery, such as a payment to obtain a contract or other commercial advantage, must never be condoned. However, the position is more difficult where "facilitation payments" are demanded by officials and others before they will undertake or complete a service which they are legally or contractually bound to provide, such as ship clearance, Port State Control or hold inspections. Such payments are treated as bribery in the national legislation of an increasing number of jurisdictions and, if paid, may lead to the imposition of criminal sanctions.

At the same time, corporate governance requirements and the need to demonstrate a commitment to combatting corruption has resulted in company policies setting out standards and procedures to be followed by their counter parties and suppliers. This, in turn, has seen the emergence of contractual anti-corruption clauses developed by charterers. However, such clauses can be one-sided, imposing strict and far-reaching consequences on owners.

National legislation is increasingly moving towards blanket bans on all forms of corruption. Thus, any payment or gift, no matter how small, is illegal. In some instances, there might be a defence of duress, but this is likely to be available only in the worst instances where there is a very real risk of physical violence or imprisonment. Low level intimidation or threats to create difficulties or delay to the ship, although unnerving, are unlikely to be considered as duress.

As a result, owners can be trapped between the increasing risk of criminal sanctions and loss of a contract if they make a payment but are uncompensated for time lost when resisting demands for unlawful payments.

### Objective

The new BIMCO clause addresses the situation by providing market users with a regime for responding to unlawful demands for gifts in cash or kind, such as cigarettes or alcohol. The clause, designed for use in both voyage and time charters, sets out a series of steps with the contracting parties working together to resist such demands

but if this fails, owners' rights to hire or uninterrupted laytime and demurrage are protected. Termination, by either party, is the ultimate sanction but a high threshold has been set so that it cannot be easily used as an exit from an inconvenient charter.

The clause is for optional use. According to party needs and circumstances, it could be put forward during fixing negotiations as an alternative to a more one-sided provision suggested by the other party.

### *Commentary*

### Sub-clause (a)

This sets out the scope of the clause. It applies as between the contracting owners and charterers and this extends to include their respective employees and agents. The provisions are effective in all jurisdictions where the parties are operating and ports and places visited.

It is important to note that the clause addresses criminal law issues and is therefore distinct from the governing law of the charter party. By way of example, the United Kingdom Bribery Act applies to any party based in or with a "close connection to"[1] the United Kingdom.  However, if parties that do not fall within the scope of the United Kingdom Bribery Act elect to apply English law as the governing law of the charter party, the United Kingdom Bribery Act will not be applicable. They will, nevertheless, be subject to provisions imposed under their own or other applicable national legislation.

*Sub-paragraph (i)* requires the parties to comply with "all applicable anti-corruption legislation". Since the clause is designed for worldwide trading and is not linked to any specific legal system, this provision aims to encompass any laws or regulations to which the parties are subject under their own national legislation or legislation in the country or jurisdiction where they are operating.

Each party must have in place procedures to ensure that their commercial dealings with counter-parties and cargo interests are designed to prevent any offence being committed by their employees or agents. This is likely to be based on a company's internal anti-corruption rules and guidance published by industry organisations. While there is no expectation that such procedures will be effective in every case, a certain and high threshold is set and parties should ensure they have robust systems in place for making appropriate background checks and undertaking due diligence in the appointment of agents and other third parties. Company procedures must also set, and enforce, high standards of conduct.

*Sub-paragraph (ii)* makes an express provision for record keeping that reflects customary company practice and statutory obligations for keeping and maintaining accounting information.  Proper recording of any payments made or gifts provided, along with the circumstances in which they were made or provided, is an essential part of a company's procedures with regards to unwarranted facilitation payments

---

[1] See http://www.legislation.gov.uk/ukpga/2010/23/section/12

**Sub-clause (b)** the substance of the clause is triggered when a request is received by the owners or the Master, for payment or goods or other items of value (defined in the clause as a "Demand") from any official, contractor or sub-contractor either engaged by the owners or charterers (such as towage contractors, pilots, hold inspectors) or acting on behalf of any third party (such as port or customs officers). If the Demand is viewed as an illegal payment, the Master or owners must notify the charterers and the two parties are to cooperate in taking reasonable steps to resist the Demand.

This procedure recognises that the Demand is a function of the port call and is a direct result of charterers' orders for the employment of the vessel. It therefore follows that the parties have a mutual interest in resolving the issue as quickly as possible while avoiding any breach of their legal obligations. Parties should, therefore, use whatever influence they can bring to bear. Owners are likely to seek assistance through their local agents or other representatives in the port and, where appropriate, might consider seeking consular assistance. Charterers, particularly where they have a permanent presence in the port or area, might be able to bring pressure through their commercial contacts (such as the shippers, terminal owners, surveyors' organisations, head or regional offices) or the local or national administration.

**Sub-clause (c)** takes the process to the next stage if the "reasonable steps" in sub-clause (b) have failed to resolve the position. At this point, the Master or owner may issue a letter of protest. Under normal circumstances, a letter of protest setting out a complaint will be addressed to local interests at the port in question. However, this might not be appropriate where the illegal Demand is being made by a service provider or where it is suspected that the letter or details will be passed on leading to further difficulties for the parties, the Master and crew. It is therefore left to the Master or owners to decide whether, and if so to whom, the letter of protest should be directed. Nevertheless, in all cases, the letter of protest must be sent or copied to the Charterers.

The letter of protest is significant as it will provide evidence that the vessel is being delayed because of the continuing, and as yet unresolved, Demand. In accordance with the logic that the port of call has been nominated by the charterers, it follows that they should bear the cost of any delay attributable to a Demand. Accordingly, once the letter of protest has been issued, the vessel remains on hire or there is no interruption to laytime or demurrage.

**Sub-clause (d)** provides mutual indemnities whereby a party that has breached anti-corruption legislation to which it is subject, must indemnify the other party against any loss or damage suffered as a result by the latter. This provision is likely to be of assistance in response to incidents of non-compliance where the termination provision in sub-clause (e) cannot be or is not invoked.

**Sub-clause (e)** sets out the criteria for termination. The provision cannot be invoked simply as an excuse to exit an inconvenient charter or used where the actions of the party seeking to rely on it have previously compromised the position of the other party.

Termination can be invoked either by owners or charterers but only where the other party has breached applicable legislation in connection with the charter; and that

3

breach has put the other, non-breaching, party in breach of anti-corruption legislation to which it is subject.

The following points should be noted:

(i) use of the provision is optional and any breach committed by one party can be disregarded by the other party;

(ii) the commission of a breach is limited to the actions of those directly employed by the breaching party and not those of agents or contractors engaged to act on their behalf. If, for example, the owners' port agent seeks an inducement from charterers to expedite, or not delay, administrative processes, the port agent's actions would not put the owner in breach;

(iii) it is expressly provided that termination must be exercised "without delay". This is to prevent a party using a prior incident as an excuse to bring the charter to an end possibly weeks or months later. The interpretation of "undue delay" will depend on case sensitive facts and circumstances; and

(iv) termination is expressly "without prejudice" to any other rights under the charter.

**Sub-clause (f)** in contrast to the foregoing provisions which respond to issues of corruption during performance of the charter, this sub-clause provides a self-standing regime warranting that the contract has not been procured by corrupt means. If breached, the innocent party may terminate the contract.

**Availability**

The full text of the Anti-Corruption Clause for Charter Parties is set out below and can also be downloaded from the BIMCO website at bimco.org:

## BIMCO Anti-Corruption Clause for Charter Parties

**(a)** The parties agree that in connection with the performance of this Charter Party they shall each:

(i) comply at all times with all applicable anti-corruption legislation and have procedures in place that are, to the best of its knowledge and belief, designed to prevent the commission of any offence under such legislation by any member of its organisation or by any person providing services for it or on its behalf; and

(i) make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect the transactions in connection with this Charter Party.

**(b)** If a demand for payment, goods or any other thing of value ("Demand") is made to the Master or the Owners by any official, any contractor or sub-contractor engaged by or acting on behalf of Owners or Charterers or any other person not employed by Owners or Charterers and it appears that meeting such Demand would breach any applicable anti-corruption legislation, then the Master or the

Owners shall notify the Charterers as soon as practicable and the parties shall cooperate in taking reasonable steps to resist the Demand.

**(c)** If, despite taking reasonable steps, the Demand is not withdrawn, the Master or the Owners may issue a letter of protest, addressed or copied to the Charterers. If the Master or the Owners issue such a letter, then, in the absence of clear evidence to the contrary, it shall be deemed that any delay to the Vessel is the result of resisting the Demand and (as applicable):

(i) the Vessel shall remain on hire; or

(ii) any time lost as a result thereof shall count as laytime or (if the Vessel is already on demurrage) as time on demurrage.

**(d)** If either party fails to comply with any applicable anti-corruption legislation it shall defend and indemnify the other party against any fine, penalty, liability, loss or damage and for any related costs (including, without limitation, court costs and legal fees) arising from such breach.

**(e)** Without prejudice to any of its other rights under this Charter Party, either party may terminate this Charter Party without incurring any liability to the other party if

(i) at any time the other party or any member of its organisation has committed a breach of any applicable anti-corruption legislation in connection with this Charter Party; and

(ii) such breach causes the non-breaching party to be in breach of any applicable anti-corruption legislation.

Any such right to terminate must be exercised without undue delay.

**(f)** Each party represents and warrants that in connection with the negotiation of this Charter Party neither it nor any member of its organisation has committed any breach of applicable anti-corruption legislation. Breach of this Sub-clause (f) shall entitle the other party to terminate the Charter Party without incurring any liability to the other.

**INTERTANKO TANKER CHARTERING QUESTIONNAIRE 88**                                                   **Version 4**

| 1. | VESSEL DESCRIPTION | | | |
|---|---|---|---|---|
| 1.1 | Date updated: | | Oct 19, 2016 | |
| 1.2 | Vessel's name (IMO number): | | Overseas Visayas (9301952) | |
| 1.3 | Vessel's previous name(s) and date(s) of change: | | CARL JACOB (Jul 18, 2007) | |
| 1.4 | Date delivered / Builder (where built): | | Sep 08, 2006 / STX SHIPBUILDING JINHAE KOREA | |
| 1.5 | Flag / Port of Registry: | | Marshall Islands / MAJURO | |
| 1.6 | Call sign / MMSI: | | V7NE6 / 538002947 | |
| 1.7 | Vessel's contact details (satcom/fax/email etc.): | | Tel: (870) 773 934 715 / +44 287 114 0781<br>Fax:<br>Email: master.ovvisayas@gtmailplus.com | |
| 1.8 | Type of vessel (as described in Form A or Form B Q1.11 of the IOPPC): | | Oil Tanker | |
| 1.9 | Type of hull: | | Double Hull | |
| **Classification** | | | | |
| 1.10 | Classification society: | | American Bureau of Shipping | |
| 1.11 | Class notation: | | +A1, OIL CARRIER, E, +AMS, +ACCU, VEC, SH, SHCM | |
| 1.12 | Is the vessel subject to any conditions of class, class extensions, outstanding memorandums or class recommendations?  If yes, give details: | | No<br>No | |
| 1.13 | If classification society changed, name of previous and date of change: | | , | |
| 1.14 | IMO type, if applicable: | | N/A | |
| 1.15 | Does the vessel have ice class? If yes, state what level: | | No, No | |
| 1.16 | Date / place of last dry-dock: | | Dec 16, 2015 / Jingjiang, China | |
| 1.17 | Date next dry dock due / next annual survey due: | | Dec 15, 2020 | Dec 15, 2016 |
| 1.18 | Date of last special survey / next special survey due: | | Dec 16, 2015 | Dec 15, 2020 |
| 1.19 | If ship has Condition Assessment Program (CAP), what is the latest overall rating: | | No, | |
| 1.20 | Does the vessel have a statement of compliance issued under the provisions of the Condition Assessment Scheme (CAS): If yes, what is the expiry date? | | N/A<br>Not Applicable | |
| **Dimensions** | | | | |
| 1.21 | Length overall (LOA): | | | 228.00 Metres |
| 1.22 | Length between perpendiculars (LBP): | | | 219.00 Metres |
| 1.23 | Extreme breadth (Beam): | | | 32.24 Metres |
| 1.24 | Moulded depth: | | | 20.65 Metres |
| 1.25 | Keel to masthead (KTM)/ Keel to masthead (KTM) in collapsed condition, if applicable: | | 49.54 Metres | 49.54 Metres |
| 1.26 | Bow to center manifold (BCM) / Stern to center manifold (SCM): | | 112.00 Metres | 116.00 Metres |
| 1.27 | Distance bridge front to center of manifold: | | | 76.80 Metres |
| 1.28 | Parallel body distances | Lightship | Normal Ballast | Summer Dwt |
| | Forward to mid-point manifold: | 66.80 Metres | 70.00 Metres | 70.00 Metres |
| | Aft to mid-point manifold: | 38.80 Metres | 57.00 Metres | 76.50 Metres |
| | Parallel body length: | 105.60 Metres | 127 Metres | 146.50 Metres |
| 1.29 | FWA/TPC at summer draft: | | 326.00 Millimetres | 68.20 Metric Tonnes |
| 1.30 | Constant (excluding fresh water): | | | 129 Metric Tonnes |
| 1.31 | What is the company guidelines for Under Keel Clearance (UKC) for this vessel? | | Open Sea: The minimum UKC in the dynamic condition is 50% of the static draft.<br>Restricted Waters/Port Approaches/Harbour: The minimum UKC in the dynamic condition is 10% of the static draft.<br>Tankers Only SBM / CBM mooring: the minimum UKC is 10% of the static draft.<br>Alongside: 1.5% of the ships beam | |
| 1.32 | What is the max height of mast above waterline (air draft) | | Full Mast | Collapsed Mast |
| | Lightship: | | 46.80 Metres | 0 Metres |
| | Normal ballast: | | 41.79 Metres | 0 Metres |
| | At loaded summer deadweight: | | 35.221 Metres | 0 Metres |
| **Tonnages** | | | | |

| 1.33 | Net Tonnage: | | 21,777.00 |
|------|--------------|---|-----------|
| 1.34 | Gross Tonnage / Reduced Gross Tonnage (if applicable): | 42,403.00 | 33,402 |
| 1.35 | Suez Canal Tonnage - Gross (SCGT) / Net (SCNT): | 44,088.95 | 38,968.19 |
| 1.36 | Panama Canal Net Tonnage (PCNT): | | 35,121.00 |

| **Ownership and Operation** | | |
|---|---|---|
| 1.37 | Registered owner - Full style: | Carl Product Corporation<br>THE TRUST COMPANY OF MARSHALL ISLANDS INC. TRUST COMPANY COMPLEX AJETAKE ISLANDS MAJURO, MARSHALL ISLANDS MH96960<br>Marshall Islands<br>Tel: +44 141 243 2435<br>Fax: +44 141 243 2436<br>Telex: Not Applicable<br>Email: ovisavc@vships.com<br>Company IMO#: 5317942 |
| 1.38 | Technical operator - Full style: | V.Ships UK Limited<br>The Skypark , 8 Elliot Place , Glasgow , G3 8EP<br>United Kingdom<br>Tel: + 44 141 243 2435<br>Fax: + 44 141 243 2436<br>Telex: N/A<br>Email: ovisavc@vships.com<br>Web: www.vships.com<br>Company IMO#: 0758614 |
| 1.39 | Commercial operator - Full style: | Panamax International c/o Cape Tankers Inc.<br>Tower Financial Center, 16th Floor, 50th Street and Elvira Mendez<br>P.O BOX 0816-01560, Panama City, Panama<br>Chile<br>Tel: +1 954 771 7757<br>Fax: N/A<br>Telex: N/A<br>Email: cape@capetankers.com<br>Web: N/A |
| 1.40 | Disponent owner - Full style: | Panamax International<br>Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro, Marshall Islands MH96960<br>Tel: +1 954 771 7757<br>Fax: N/A<br>Telex: N/A<br>Email: cape@capetankers.com<br>Web: N/A |

| 2. | CERTIFICATION | Issued | Last Annual | Expires |
|----|---------------|--------|-------------|---------|
| 2.1 | Safety Equipment Certificate (SEC): | Dec 16, 2015 | | Dec 15, 2020 |
| 2.2 | Safety Radio Certificate (SRC): | Dec 16, 2015 | | Dec 15, 2020 |
| 2.3 | Safety Construction Certificate (SCC): | Dec 16, 2015 | | Dec 15, 2020 |
| 2.4 | International Loadline Certificate (ILC): | Dec 16, 2015 | | Dec 12, 2020 |
| 2.5 | International Oil Pollution Prevention Certificate (IOPPC): | Dec 16, 2015 | | Dec 16, 2020 |
| 2.6 | ISM Safety Management Certificate (SMC): | Nov 30, 2014 | Aug 13, 2015 | Nov 29, 2019 |
| 2.7 | Document of Compliance (DOC): | May 15, 2013 | Jun 03, 2016 | Jul 23, 2018 |
| 2.8 | USCG Certificate of Compliance (COC): | Aug 11, 2015 | Aug 14, 2016 | Aug 11, 2017 |
| 2.9 | Civil Liability Convention (CLC) 1992 Certificate: | Feb 20, 2016 | Not Applicable | Feb 20, 2017 |
| 2.10 | Civil Liability for Bunker Oil Pollution Damage Convention (CLBC) Certificate: | Feb 20, 2016 | Not Applicable | Feb 20, 2017 |
| 2.11 | Ship Sanitation Control (SSCC)/Ship Sanitation Control Exemption (SSCE) Certificate: | Aug 09, 2016 | Not Applicable | Oct 08, 2017 |
| 2.12 | U.S. Certificate of Financial Responsibility (COFR): | Apr 30, 2017 | Not Applicable | Apr 30, 2017 |
| 2.13 | Certificate of Class (COC): | Dec 16, 2015 | Not Applicable | Dec 15, 2020 |

| 2.14 | International Sewage Pollution Prevention Certificate (ISPPC): | Dec 16, 2015 | Not Applicable | Dec 16, 2020 |
|------|-----------------------------------------------------------------|--------------|----------------|--------------|
| 2.15 | Certificate of Fitness (COF): | Not Applicable | Not Applicable | Not Applicable |
| 2.16 | International Energy Efficiency Certificate (IEEC): | Oct 08, 2014 | Not Applicable | Not Applicable |
| 2.17 | International Ship Security Certificate (ISSC): | Nov 30, 2014 | | Nov 29, 2019 |
| 2.18 | International Air Pollution Prevention Certificate (IAPPC): | Dec 12, 2015 | | None |
| 2.19 | Maritime Labour Certificate (MLC): | Nov 30, 2014 | Not Applicable | Nov 29, 2019 |

| Documentation | | | |
|------|-----------------------------------------------------------------|--------------|
| 2.20 | Owner warrant that vessel is member of ITOPF and will remain so for the entire duration of this voyage/contract: | Yes |
| 2.21 | Does vessel have in place a Drug and Alcohol Policy complying with OCIMF guidelines for Control of Drugs and Alcohol Onboard Ship? | Yes |
| 2.22 | Is the ITF Special Agreement on board (if applicable)? | Yes |
| 2.23 | ITF Blue Card expiry date: | Dec 31, 2016 |

| 3. | CREW | |
|------|-----------------------------------------------|---------|
| 3.1 | Nationality of Master: | Filipino |
| 3.2 | Number and Nationality of Officers: | 9 Filipino |
| 3.3 | Number and Nationality of Crew: | 12 Filipino |
| 3.4 | What is the common working language onboard: | English |
| 3.5 | Do officers speak and understand English? | Yes |
| 3.6 | If Officers/Crew employed by a Manning Agency - Full style: | Officers: Pacific Ocean Manning Inc Lot 1 Block 37, Aseana Two Bldg. Bradco Avenue, Aseana City, Paranaque 1702 Metro Manila, Philippines Tel: 63-2-858-9900 Fax: 63-2-858-9896 Email: ovisacd@vships.com<br><br>Crew: Pacific Ocean Manning Inc. Lot 1 Block 37, Aseana Two Bldg. Bradco Avenue, Aseana City, Paranaque 1702 Metro Manila, Philippines Tel: 63-2-858-9900 Fax: 63-2-858-9896 Email: ovisacd@vships.com |

| 4. | FOR USA CALLS | |
|------|-----------------------------------------------|---------|
| 4.1 | Has the vessel Operator submitted a Vessel Spill Response Plan to the US Coast Guard which has been approved by official USCG letter? | Yes |
| 4.2 | Qualified individual (QI) - Full style: | O'Brien's Oil Pollution Service 103 MORGAN LANE , SUITE 103 , PLAINSBOROUGH , NEW JERSEY , 08536 , UNITED STATES Tel: +1 985 781 0804 Fax: + 1 (609) 275 9444 Email: commandcenter@wittobriens.com Web: www.wittobriens.com |
| 4.3 | Oil Spill Response Organization (OSRO) - Full style: | National Response Corporation 3500 Sunrise Highway Suite T103 Great River, 11739 Tel: 1-631-224-9141 Fax: +1-631-224-9086 Email: iocdo@nrcc.com |

| 5. | CARGO AND BALLAST HANDLING | |
|------|-----------------------------------------------|---------|
| Double Hull Vessels | | |
| 5.1 | Is vessel fitted with centerline bulkhead in all cargo tanks? If Yes, solid or perforated: | Yes, Solid |

**Loadline Information**

| 5.2 | Loadline | Freeboard | Draft | Deadweight | Displacement |
|---|---|---|---|---|---|
| | Summer: | 6.37 Metres | 14.32 Metres | 74,933.00 Metric Tonnes | 88,871.00 Metric Tonnes |
| | Winter: | 6.66 Metres | 14.02 Metres | 72,901.00 Metric Tonnes | 86,840.00 Metric Tonnes |
| | Tropical: | 6.07 Metres | 14.62 Metres | 76,961.00 Metric Tonnes | 90,916.00 Metric Tonnes |
| | Lightship: | 17.932 Metres | 2.752 Metres | Not Applicable | 13,938.00 Metric Tonnes |
| | Normal Ballast Condition: | 13.27 Metres | 7.41 Metres | 23,542.00 Metric Tonnes | 43,480.00 Metric Tonnes |

| 5.3 | Does vessel have multiple SDWT? If yes, please provide all assigned loadlines: | No |
|---|---|---|

**Cargo Tank Capacities**

| 5.4 | Number of cargo tanks and total cubic capacity (98%): | 14 | 80,365.30 Cu. Metres |
|---|---|---|---|
| 5.5 | Capacity (98%) of each natural segregation with double valve (specify tanks): | Seg#1: 28084.5 m3 ((1P/S, 4 P/S & Slop P/S)) Seg#2: 27762.8 m3 ((2P/S & 5 P/S)) Seg#3: 27384.8 m3 ((3P/S & 6 P/S)) | |
| 5.6 | Number of slop tanks and total cubic capacity (98%): | 2 | 2,866.80 Cu. Metres |
| 5.7 | Specify segregations which slops tanks belong to and their capacity with double valve: | | |
| 5.8 | Residual/Retention oil tank(s) capacity (98%), if applicable: | | 191.30 Cu. Metres |
| 5.9 | Does vessel have Segregated Ballast Tanks (SBT) or Clean Ballast Tanks (CBT): | SBT | |

**SBT Vessels**

| 5.10 | What is total SBT capacity and percentage of SDWT vessel can maintain? | 30,039.90 Cu. Metres | 40.10 % |
|---|---|---|---|
| 5.11 | Does vessel meet the requirements of MARPOL Annex I Reg 18.2: | Yes | |

**Cargo Handling and Pumping Systems**

| 5.12 | How many grades/products can vessel load/discharge with double valve segregation: | 3 |
|---|---|---|
| 5.13 | Are there any cargo tank filling restrictions? If yes, specify number of slack tanks, max s.g., ullage restrictions etc.: | No no |

| 5.14 | Pumps | No. | Type | Capacity | At What Head (sg=1.0) |
|---|---|---|---|---|---|
| | Cargo Pumps: | 3 | Centrifugal | 2000 M3/HR | 130 Meters 130 Meters 130 Meters |
| | Cargo Eductors: | 1 | Other | 300 Cu. Metres/Hour | |
| | Stripping: | 1 | Reciprocating | 200 Cu. Metres/Hour | |
| | Ballast Pumps: | 2 | Centrifugal | 1,250 Cu. Metres/Hour | 25 Metres |
| | Ballast Eductors: | 1 | Other | 300 Cu. Metres/Hour | |

| 5.15 | Max loading rate for homogenous cargo per manifold connection: | 2,540 Cu. Metres/Hour |
|---|---|---|
| 5.16 | Max loading rate for homogenous cargo loaded simultaneously through all manifolds: | 7,620.00 Cu. Metres/Hour |
| 5.17 | How many cargo pumps can be run simultaneously at full capacity: | 3 |

**Cargo Control Room**

| 5.18 | Is ship fitted with a Cargo Control Room (CCR)? | Yes |
|---|---|---|
| 5.19 | Can tank innage / ullage be read from the CCR? | Yes |

**Gauging and Sampling**

| 5.20 | Can cargo be transferred under closed loading conditions in accordance with ISGOTT 11.1.6.6? | Yes |
|---|---|---|
| 5.21 | What type of fixed closed tank gauging system is fitted: | Radar |
| 5.22 | Number of portable gauging units (example- MMC) on board: | 6 |
| 5.23 | Are overfill (high) alarms fitted? If Yes, indicate whether to all tanks or partial: | Yes, All |
| 5.24 | Are cargo tanks fitted with multipoint gauging? If yes, specify type and locations: | No, |
| 5.25 | Is gauging system certified and calibrated? If no, specify which ones are not calibrated: | Yes, |

**Vapor Emission Control System (VECS)**

| 5.26 | Is a Vapour Emission Control System (VECS) fitted? | Yes | |
|---|---|---|---|
| 5.27 | Number/size of VECS manifolds (per side): | 2 | 350 Millimetres |
| 5.28 | Number / size / type of VECS reducers: | 4 - 14 x 16 | |

|  |  | 2 - 14 x 12<br>1 - 14 x 10 |  |
|---|---|---|---|

**Venting**

| 5.29 | State what type of venting system is fitted: | COMMON + INDIVIDUAL P/V VALVES | |
|---|---|---|---|

**Cargo Manifolds and Reducers**

| 5.30 | Does vessel comply with the latest edition of the OCIMF 'Recommendations for Oil Tanker Manifolds and Associated Equipment'? | Yes | |
|---|---|---|---|
| 5.31 | Total number / size of cargo manifold connections on each side: | 3 / 400.00 Millimetres | |
| 5.32 | What type of valves are fitted at manifold: | Butterfly | |
| 5.33 | What is the material/rating of the manifold: | MILD STEEL / ANSI 150 LBS | |
| 5.34 | Does the vessel have a Common Line Manifold connection? If yes, describe: | CROSS-OVERS | |
| 5.35 | Distance between cargo manifold centers: | | 2,500.00 Millimetres |
| 5.36 | Distance ships rail to manifold: | | 4,600.00 Millimetres |
| 5.37 | Distance manifold to ships side: | | 4,600.00 Millimetres |
| 5.38 | Top of rail to center of manifold: | | 800.00 Millimetres |
| 5.39 | Distance main deck to center of manifold: | | 2,100.00 Millimetres |
| 5.40 | Spill tank grating to center of manifold: | | 900.00 Millimetres |
| 5.41 | Manifold height above the waterline in normal ballast / at SDWT condition: | 15.20 Metres | 8.45 Metres |
| 5.42 | Number / size / type of reducers: | 6 x 400/400mm (16/16")<br>3 x 400/300mm (16/12")<br>3 x 400/250mm (16/10")<br>3 x 400/200mm (16/8")<br>2 x 400/150mm (16/6")<br>ANSI | |
| 5.43 | Is vessel fitted with a stern manifold?  If yes, state size: | No, | |

**Heating**

| 5.44 | Cargo / slop tanks fitted with a cargo heating system? | Type | Coiled | Material |
|---|---|---|---|---|
| | Cargo Tanks: | HEATING COIL | Yes | SS |
| | Slop Tanks: | STEAM | Yes | SS |
| 5.45 | Maximum temperature cargo can be loaded / maintained: | | 66.0 °C / 150.8 °F | 57.2 °C / 134.96 °F |
| 5.46 | Minimum temperature cargo can be loaded / maintained: | | | |

**Coating / Anodes**

| 5.47 | Tank Coating | Coated | Type | To What Extent | Anodes |
|---|---|---|---|---|---|
| | Cargo tanks: | Yes | Epoxy | Whole Tank | No |
| | Ballast tanks: | Yes | epoxy | Whole Tank | Yes |
| | Slop tanks: | Yes | Epoxy | Whole Tank | No |

| 6. | INERT GAS AND CRUDE OIL WASHING | |
|---|---|---|
| 6.1 | Is a Crude Oil Washing (COW) installation fitted / operational? | Yes / Yes |
| 6.2 | Is an Inert Gas System (IGS) fitted / operational? | Yes / Yes |
| 6.3 | Is IGS supplied by flue gas, inert gas (IG) generator and/or nitrogen: | Flue Gas |

| 7. | MOORING | | | | | |
|---|---|---|---|---|---|---|
| 7.1 | Wires (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 6 | 36.00 Millimetres | GALVANIZED | 250.00 Metres | 74.00 Metric Tonnes |
| | Main deck fwd: | 2 | 36.00 Millimetres | GALVANIZED | 250.00 Metres | 74.00 Metric Tonnes |
| | Main deck aft: | 2 | 36.00 Millimetres | GALVANIZED | 250.00 Metres | 74.00 Metric Tonnes |
| | Poop deck: | 6 | 36.00 Millimetres | GALVANIZED | 250.00 Metres | 74.00 Metric Tonnes |
| 7.2 | Wire tails | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 6 | 72.00 Millimetres | POLYESTER + POLYPROPYLENE | 11.00 Metres | 126.00 Metric Tonnes |
| | Main deck fwd: | 2 | 72.00 Millimetres | POLYESTER + POLYPROPYLENE | 11.00 Metres | 126.00 Metric Tonnes |
| | Main deck aft: | 2 | 72.00 Millimetres | POLYESTER | 11.00 Metres | 126.00 Metric Tonnes |

| | | | | +POLYPROPYLENE | | |
|---|---|---|---|---|---|---|
| | Poop deck: | 6 | 72.00 Millimetres | 50% POLYESTER; 50% POLYSTEEL | 11.00 Metres | 126.00 Metric Tonnes |
| 7.3 | Ropes (on drums) | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | | | | | |
| | Main deck fwd: | | | | | |
| | Main deck aft: | | | | | |
| | Poop deck: | | | | | |
| 7.4 | Other lines | No. | Diameter | Material | Length | Breaking Strength |
| | Forecastle: | 7 | 60 Millimetres | 40% Polyester +60% Polysteel | 220 Metres | 74.40 Metric Tonnes |
| | Main deck fwd: | | | | | |
| | Main deck aft: | 3 | 60 Millimetres | NYLON ROPE | 220 Metres | 76.40 Metric Tonnes |
| | Poop deck: | 7 | 60 Millimetres | 40% Polyester +60% Polysteel | 220 Metres | 74.40 Metric Tonnes |
| 7.5 | Winches | No. | No. Drums | Motive Power | Brake Capacity | Type of Brake |
| | Forecastle: | 2 | TRIPLE DRUM | Hydraulic | 44.40 Metric Tonnes | brake band |
| | Main deck fwd: | 1 | DOUBLE | Hydraulic | 44.40 Metric Tonnes | brake band |
| | Main deck aft: | 1 | Double Drums | Hydraulic | 44.40 Metric Tonnes | brake band |
| | Poop deck: | 2 | TRIPLE DRUM | Hydraulic | 44.40 Metric Tonnes | brake band |
| 7.6 | Bitts, closed chocks/fairleads | | No. Bitts | SWL Bitts | No. Closed Chocks | SWL Closed Chocks |
| | Forecastle: | | 6 | 74 Metric Tonnes | 16 | 64 Metric Tonnes |
| | Main deck fwd: | | 4 | 74 Metric Tonnes | 8 | 64 Metric Tonnes |
| | Main deck aft: | | 4 | 74 Metric Tonnes | 8 | 64 Metric Tonnes |
| | Poop deck: | | 8 | 74 Metric Tonnes | 21 | 64 Metric Tonnes |

**Anchors/Emergency Towing System**

| | | |
|---|---|---|
| 7.7 | Number of shackles on port / starboard cable: | 12 / 12 |
| 7.8 | Type / SWL of Emergency Towing system forward: | chafing Chain | 200 Metric Tonnes |
| 7.9 | Type / SWL of Emergency Towing system aft: | EST | 200 Metric Tonnes |

**Escort Tug**

| | | | |
|---|---|---|---|
| 7.10 | What is size / SWL of closed chock and/or fairleads of enclosed type on stern: | 600 x 450 | 200.00 Metric Tonnes |
| 7.11 | What is SWL of bollard on poop deck suitable for escort tug: | | 200.00 Metric Tonnes |

**Bow/Stern Thruster**

| | | |
|---|---|---|
| 7.12 | What is brake horse power of bow thruster (if fitted): | No, |
| 7.13 | What is brake horse power of stern thruster (if fitted): | No, |

**Single Point Mooring (SPM) Equipment**

| | | | |
|---|---|---|---|
| 7.14 | Does the vessel meet the recommendations in the latest edition of OCIMF 'Recommendations for Equipment Employed in the Bow Mooring of Conventional Tankers at Single Point Moorings (SPM)'? | Yes | |
| 7.15 | If fitted, how many chain stoppers: | 2 | |
| 7.16 | State type / SWL of chain stopper(s): | TOUNGUE TYPE | 200.00 Metric Tonnes |
| 7.17 | What is the maximum size chain diameter the bow stopper(s) can handle: | | 76.00 Millimetres |
| 7.18 | Distance between the bow fairlead and chain stopper/bracket: | | 2,900 Millimetres |
| 7.19 | Is bow chock and/or fairlead of enclosed type of OCIMF recommended size (600mm x 450mm)? If not, give details of size: | Yes Millimetres | |

**Lifting Equipment**

| | | |
|---|---|---|
| 7.20 | Derrick / Crane description (Number, SWL and location): | Derricks: 0.00 Tonnes, Cranes: 1 x 15.00 Tonnes Center |
| 7.21 | What is maximum outreach of cranes / derricks outboard of the ship's side: | 6.50 Metres |

**Ship To Ship Transfer (STS) / Helicopter Operations**

| | | |
|---|---|---|
| 7.22 | Does vessel comply with recommendations contained in OCIMF/ICS Ship To Ship Transfer Guide (Petroleum, Chemicals or Liquified Gas, as applicable)? | Yes |
| 7.23 | Can the ship comply with the ICS Helicopter Guidelines? If Yes, state whether winching or landing area provided and diameter of the circle provided: | Yes, Winching 5.00 Metres |

| 8. | MISCELLANEOUS | | | | |
|---|---|---|---|---|---|
| **Engine** | | | | | |
| 8.1 | Speed | | | Maximum | Economic |
| | Ballast speed: | | | 15 Knots (WSNP) | 12.50 Knots (WSNP) |
| | Laden speed: | | | 14.50 Knots (WSNP) | 12.00 Knots (WSNP) |
| 8.2 | What type of fuel is used for main propulsion / generating plant: | | | IFO 380 / MGO | IFO 380 / MGO |
| 8.3 | Type / Capacity of bunker tanks: | | | Fuel Oil: 1,706.70 Cu. Metres  Diesel Oil: 869.70 Cu. Metres  Gas Oil: 0 Cu. Metres | |
| 8.4 | Is vessel fitted with fixed or controllable pitch propeller(s): | | | Fixed | |
| 8.5 | Engines | No | Capacity | | Make/Type |
| | Main engine: | 1 | 13,560 Kilowatt | | STX MAN B&W 6S 60 MC-C |
| | Aux engine: | 3 | 860 Kilowatt | | STX MAN B&W 6L 23/30H |
| | Power packs: | | | | |
| | Boilers: | 2 | 25.00 Metric Tonnes/Hour | | KANGRIM Industries Co. Ltd. |
| **Emissions** | | | | | |
| 8.6 | Main engine IMO NOx emission standard: | | | Tier I | |
| 8.7 | Energy Efficiency Design Index (EEDI) rating number: | | | N/A | |
| **Insurance** | | | | | |
| 8.8 | P & I Club - Full Style: | | | NORTH OF ENGLAND  The Quayside, Newcastle Upon Tyne, NE1 3DU UK  Tel: (904)3561306 / +44 (  Fax: +44 (0)191 2610540  Email: jmoseleyjr@mppkj.com  Web: www.nepia.com | |
| 8.9 | P & I Club pollution liability coverage / expiration date: | | | 1,000,000,000 US$ | Feb 20, 2017 |
| 8.10 | Hull & Machinery insured by - Full Style: | | | Marsh USA, Inc.  1166 Avenue of the Americas  New York, NY 10036 | |
| 8.11 | Hull & Machinery insured value / expiration date: | | | 32,000,000 US$ | Nov 15, 2016 |
| **Recent Operational History** | | | | | |
| 8.12 | Date and place of last Port State Control inspection: | | | Aug 14, 2016 / San Francisco, USA | |
| 8.13 | Any outstanding deficiencies as reported by any Port State Control?  If yes, provide details: | | | No  N/A | |
| 8.14 | Has vessel been involved in a pollution, grounding, serious casualty or collision incident during the past 12 months?  If yes, full description: | | | Pollution: No, N/A  Grounding: No, N/A.  Casualty: No, N/A  Collision: No, N/A | |
| 8.15 | Last three cargoes / charterers / voyages (Last / 2nd Last / 3rd Last): | | | FUEL OIL / ENAP / TALCAHUANO - SAN VICENTE - BALBOA    CRUDE OIL / VALERO / VANCOUVER CANADA - BENICIA SAN FRANCISCO CA. USA    CRUDE OIL / PHILLIPS 66 / VANCOUVER CANADA - LONG BEACH | |
| 8.16 | Date/place of last STS operation: | | | 26 JAN 2016 / PAL | |
| **Vetting** | | | | | |
| 8.17 | Date of last SIRE inspection: | | | Aug 03, 2016 | |
| 8.18 | Date of last CDI inspection: | | | N/A | |
| 8.19 | Recent Oil company inspections/screenings (To the best of owners knowledge and without guarantee of acceptance for future business)*:  * "Approvals" are not given by Oil Majors and ships are accepted for the voyage on a case by case basis. | | | Idemitsu | |
| **Additional Information** | | | | | |

| 8.20 | Additional information relating to features of the ship or operational characteristics: | NIL |
|------|------------------------------------------------------------------------------------------|-----|

Rev 2015 (INTERTANKO / Q88.com)

Form completed on http://www.q88.com/integration.aspx  Please email support@q88.com an updated copy if this is not the latest version.